## THE STATE v. ED BOWEN, Appellant.

Division Two, February 19, 1913

1. **APPEAL: In Criminal Case: No Assignment of Errors.** Although appellant in a criminal case furnishes no brief or assignment of errors, the court, in pursuance to the plain requirements of the statute (Sec. 5312, R. S. 1909,), will carefully examine the record for the purpose of determining whether any ground of error stated in his motion for a new trial has any basis in fact.

2. **STATUTORY RAPE: Corpus Delicti: Sufficiency of Evidence.** The *corpus delicti*, in a case of statutory rape, consists (1) of a criminal act and (2) of the defendant's agency in the production of the act. In this case the age of the girl is clearly established to have been under fourteen years at the time she gave birth to the child and died, and the court takes judicial notice therefrom that some person had sexual intercourse with her; but the proof that such person was the defendant is not clear, but, on the whole, is held sufficient to sustain the verdict of guilty.

3. ———: ———: ———: **Administration of Calomel.** But the holding that the evidence is sufficient to sustain the verdict is made in view of the facts (among others) that the girl was defendant's step-daughter, and lived in his home; that five or six months prior to the birth of a still-born child and a miscarriage, followed by peritonitis and her death, he and she had been for about two hours alone in a corn field; that she was not known to have been in the company of any other man or boy; that peritonitis often follows the taking of drastic and irritating medicine; that a justice of the peace testified that defendant (at a time when he knew the child was pregnant) told him he had secured a bottle of calomel while in town and made inquiry as to how the same should be administered; and that though this fact looms large in the case, by inference, and the proof and physicians were at hand, none of them was asked what might be the effect of administering this drastic drug to a pregnant woman.

4. **CONTRADICTING WITNESS: Statement Made Out of Court: Not Conflicting: Improper Hearsay.** A witness may be impeached by showing that his testimony in court is different from some statement made by him out of court. But the two statements must conflict. The one made out of court must be inconsistent with some fact stated by him in his testimony, or with its general drift. So that where defendant's mother had testified to no statement made by defendant, or any fact pointing to his guilt of the charge of carnal knowledge of his step-daughter, it was error for the court to permit, over defendant's objection, the prosecuting attorney to ask the mother if another woman, after the girl's child was born and she was dead, and in defendant's absence, "didn't ask you who was the father of this child, and you told her . . . it was laid on" defendant and defendant "had admitted to Calvin Lane that he was the father of the child?" And it was likewise error to permit the said other woman, upon being called, to testify that the mother had stated that "they had accused this defendant of it and he had admitted it to Calvin Lane."

State v. Bowen.

Appeal from Carter Circuit Court.—*Hon. W. N. Evans*, Judge.

REVERSED AND REMANDED.

*L. O. Neider* for appellant.

*Elliott W. Major*, Attorney-General, and *Ernest A. Green*, Assistant Attorney-General, for the State.

(1)  The most serious question in this case is that with reference to the sufficiency of the evidence as establishing the guilt of the defendant.  At first glance the testimony would seem to be insufficient, but when it is carefully analyzed and all the essential elements of this offense considered with relation to the testimony offered, the evidence is amply sufficient to sustain the verdict of the jury.  That some person committed rape on this mere child is evidenced by the birth of a child when she was but a few days over the age of thirteen years.  Under such circumstances it was only necessary for the State by either direct or circumstantial evidence, to prove that the defendant was the person who committed the offense.  Bill v. State, 5 Humph. (Tenn.) 155.  The confessions or admissions of defendant are sufficient identification.  33 Cyc. 1488; State v. Icenbice, 126 Ia. 16; People v. Darr, 3 Cal. App. 50.  Where there is substantial evidence tending to show defendant's guilt this court will not undertake to weigh the evidence, but will defer to the action of the jury in such matters.  State v. Smith, 190 Mo. 706; State v. Williams, 186 Mo. 128; State v. Williams, 149 Mo. 500; State v. Tetrick, 199 Mo. 104.  (2)  Mrs. Ellen Burnham, a witness for the State in rebuttal, was asked if she had had a conversation with the mother of the defendant, in which Mrs. Bowen had told her that they had accused the defendant of being the father of Naomi's child, and that he had admitted it to Calvin Lane.  When Mrs. Bowen was

on the stand as a witness for the defendant, she had been asked, over the objection and exception of defendant's counsel, as to having this conversation with Mrs. Burnham and had denied having such conversation. Mrs. Bowen had previously testified that Mrs. Burnham had never asked her who was the father of the child. When Mrs. Bowen had testified positively that she did not know who was the father of Naomi's child, it was competent to ask her for the purpose of laying the foundation for impeachment, if she had not told Mrs. Burnham that the defendant had admitted that he was the father of the child. When she denied this conversation it was proper by way of impeachment to prove by Mrs. Burnham that such a conversation did occur. State v. Mulhall, 199 Mo. 212; State Forsha, 190 Mo. 324; Hannon v. Transit Co., 102 Mo. App. 216; State v. Gatlin, 170 Mo. 354; Rodan v. Transit Co., 207 Mo. 407; Schloemer v. Transit Co., 204 Mo. 99.

FARIS, J.—Prosecution for statutory rape alleged to have been committed upon one Naomi Headrick, a female child under the age of fourteen years. The prosecution is based upon an indictment presented

Rape.

by the grand jury of Shannon county, Missouri, on September 26, 1911. The case was tried in the circuit court of Carter county, Missouri, to which county the venue was changed by an order made by the circuit court of Shannon county, upon the application of the defendant.

The case came on for trial in the circuit court of said Carter county at the April term and on the 10th day of April, 1912. The defendant was duly arraigned and entered a plea of not guilty. Thereupon, the case was submitted to a jury, which jury in due course returned a verdict of guilty against the defendant and assessed his punishment at imprisonment in the penitentiary for a term of ten years. Timely mo-

tions for a new trial and a so-called motion in arrest of judgment were filed and overruled, and following the latter action judgment and sentence were duly pronounced against defendant in accordance with the verdict of the jury. We assume since no *supersedeas* order was entered and since defendant now prosecutes this appeal as a poor person, that he is now confined in the penitentiary.

The testimony and other matters proper therein were preserved by a timely bill of exceptions, which was duly and legally made a part of the record, and which is before us. From this bill of exceptions the facts shown by the testimony upon the trial seem to be substantially these:

Naomi Headrick, upon whom the rape was charged to have been committed, was the step-daughter of the defendant and resided with defendant and defendant's wife, who was the mother of said Naomi, on a farm in Shannon county, Missouri. Said Naomi died in Shannon county on August 27, 1911, at **Facts.** the age of thirteen years and nine days. The cause of her death, as shown by the uncontradicted testimony, was peritonitis, superinduced by a miscarriage, wherein she was delivered of a foetus, apparently some five or six months advanced.

Dr. O'Dell, a witness for the State, testified that on the morning of August 20, about the middle of the day, he saw the girl Naomi professionally; found her suffering with an acute gastric disturbance of the stomach and bowels, indicating a cholera morbus condition, accompanied by vomiting and purging; that she was about five months advanced in pregnancy; but that he is not, and says that he could not be, certain as to the exact time. This witness saw her again on August 23 and found her bordering on peritonitis. He again saw her on August 25 and discovered that she had miscarried late in the afternoon of August 23; that she then had (that is, on August 25) a well-

developed case of peritonitis. This witness saw her again on August 27; found her rapidly failing, and says that she died on that evening. This physician further says that peritonitis may often occur as a result of taking drastic and irritating medicine.

Dr. Chilton, a witness for the State, testified touching a consultation that defendant had with him as to the condition of Naomi; in this conversation defendant spoke of a swelling or dropsical condition from which she was suffering, stating to the doctor that this condition had existed for some four or five months, and that it had come on gradually. Being asked as to the girl's monthly periods, he stated that there had been five or six months during which these had not occurred, but that prior to that time she had been regular; defendant stated to this physician that his wife thought perhaps the girl was pregnant, but that he (defendant) didn't know anything about it. Questioned by the physician as to whether the girl had been keeping company with any boys, he said that she had not, and that there was no possibility of any boys having come there. Some medicine of an unnamed sort was given to Bowen by this witness for the girl; but the nature thereof (except the statement of the physician that it was harmless, her condition considered) does not appear.

James Tripp, a justice of the peace of Shannon county, testifying for the State, says in substance that on August 11, 1911, a short time before Naomi became ill, defendant told him that he had procured a bottle of calomel while he was in town and made inquiry of the witness Tripp as to how the same should be issued or dosed. This witness also testifies as to the escape of the defendant from the custody of persons to whom the witness Tripp, as justice of the peace, had delivered defendant, after the latter's arrest upon this charge.

Further there was uncontradicted evidence from other witnesses as to the fact that while in custody charged with this offense defendant escaped from his custodians and fled the country. Some months afterward defendant was found at Truman, Arkansas, passing under the assumed name of John Martin. He was arrested in Arkansas and brought back by the sheriff of Carter county prior to the trial. It may be said in passing and in fairness to the defendant, that he explains his flight upon the theory that he fled in order to escape mob violence, threats of which reached him for the first time a few minutes before his escape from the officers. As to the existence of this mob sentiment in the community and of reports thereof having reached defendant, he is corroborated by three other witnesses whom he offered, and who say in substance, that there was general talk in the community to the effect that defendant ought to be mobbed or hung, but that no one took any steps toward organizing such mob; though one of these latter witnesses states that he was informed before defendant fled that the mob was actually forming.

The record contains no evidence of actual access to Naomi Headrick by the defendant, nor are there shown any actions whatever on the part of the defendant toward Naomi indicating that his relations toward her were not those simply of a step-father to a step-daughter residing in his family. However, this exclusion of opportunity applies also to the other males in the community, since the record shows that the girl kept no company with the boys in the neighborhood, and that she "had no beaux," as one witness expresses it. It is shown, however, by one witness, that on the 28th of February, 1911, defendant and Naomi were together by themselves in a corn field for some two hours.

Outside of the facts above stated, the testimony upon which the State relies for a conviction was in its

State v. Bowen.

nature circumstantial and it consisted wholly in state-
ments and admissions of the defendant, not amounting
to absolute or definite confession of the fact.

Defendant is found on the day that Naomi was
buried asking those present there to pray for him,
and, putting it in their words, he said: "Pray for me
and pray for me hard." This testimony and all of it
comes from the relatives of defendant.

Calvin Lane, defendant's brother-in-law, states
that about August 10, a few days prior to the begin-
ning of Naomi's illness, defendant told him that he
thought Naomi was in a family way. This witness
further states that just prior to the girl's death de-
fendant shook hands with him and said "he had got
forgiveness for what he had done."

Isaac Headrick, another brother-in-law, testified
that on the day following the death of Naomi, he heard
defendant say to defendant's wife: "Emmeline, don't
grieve, the Lord has forgive me and he will you; you
haven't done half what I have; I have done it all."
This statement of the above witness is corroborated
in its entirety by one Lewis Headrick, who seems also
to have been a brother-in-law of defendant.

Marion Tinker, who is a relative of defendant, but
in what degree does not appear from the record, testi-
fied as to the escape of defendant from custody and
as to a conversation had with defendant in which de-
fendant said to this witness that the charge against
him (defendant) "was a mighty serious thing, but
that he didn't have to tell anything to give himself
away."

The above is a fair substance of the testimony ad-
duced upon the trial by the State.

On the part of the defendant, he, being called as a
witness, denied that he had ever had sexual intercourse
with Naomi Headrick; he also denied specifically,
statements attributed to him by the witnesses for the
State, except that he admitted having a conversation

with his wife (being the same referred to by the Headricks), but he says that in this conversation he used these words: "Emmeline, quit weeping; Naomi is better off than we are; I hope she is; you put your trust in God Almighty; he will help you out of your trouble." So in fact he denies making the statements attributed to him by the witnesses for the State, all of whom testifying to his statements were his kin.

Defendant's wife testifying for him states that Naomi ceased to have her regular monthly periods about the last of March, 1911; she further says that she never asked Naomi about the pregnancy of the latter, "thinking that she would wait until the girl got well and then have a talk with her." This witness says that Naomi had not been away from home at any time for five or six months prior to her death, except one night when she stayed at the house of one Moss, a neighbor.

Off-setting this, Mrs. Bessie Moss was called by the State in rebuttal, and stated that sometime about February Naomi came home with witness's little girl; that she stayed all night, slept with two of Mrs. Moss's girls, and that nothing untoward occurred.

Defendant offered testimony touching his previous good character, which was shown to have been "good" or "pretty good," or as Sen. George T. Lee expressed it, "fairly good," in the community in which he resided.

At the trial Mrs. M. C. Bowen, the mother of the defendant, was called in his behalf. Since her testimony is considered by us important, we append it in full: "My name is M. C. Bowen; I am the mother of defendant and knew Naomi Headrick; I was there when she delivered her child, but was not there until after it was born; I cut the after-birth; cut the cord; it came from her naturally; I wasn't there all the time after the birth of the child; they sent for me, but I can't say the number of days. I was at the funeral;

the people at the graveyard didn't act like it was a funeral; they were just running in squads, here and yonder, two, three, four and five in a place; I saw Moss there; I didn't hear them say anything about punishment for Ed Bowen. I never saw people act like that at a funeral before; I couldn't pay any attention to the preacher for looking at them. We had corn planted next to the graveyard, and they would go running and jump into that. I remember the morning Ed left; I believe it was the next morning after the funeral. Moss and Uncle Marion and Williams and Ed were at the spring; but I didn't hear the conversation between my son and Williams. I don't know how far advanced in pregnancy that girl was, nor whether the child was born alive; it was dead and cold when I got there. Dr. O'Dell says she was four or five months along.'' Upon her cross-examination this witness further testified: ''Q. You say you are the mother of the defendant? A. Yes, sir. Q. Are you acquainted with Ellen Burnham? A. I don't know whether I am or not. I have seen her several times. Q. Wasn't .she down there during the sickness of this girl, and after she died? A. I can't say that she was there while the girl was sick; she was there after the girl died. Q. Didn't you ask her there, after the death of the girl, if she had heard what happened, and stated to her that the girl had miscarried? A. I don't remember, I don't know what I did. Q. Didn't she ask you if they knew who the father of the child was? A. I don't remember whether she did or not; I don't think she did. Q. I will ask you if she didn't ask you if *they knew* who the father of this child was and you told her that Naomi was not keeping company with anyone, but that it was laid on Ed Bowen, and that Ed Bowen had admitted to Calvin Lane that he was the father of the child? Objected to by defendant as hearsay evidence, which objection

247 Mo.—38

was by the court overruled, to which ruling of the court the defendant excepted at the time. A. No, sir; I didn't say anything like that."

In rebuttal, Mrs. Ellen Burnham being re-called by the State, testified as follows: "Q. Are you acquainted with Mrs. M. C. Bowen, mother of the defendant? A. Yes, sir. Q. Did you see her on the day this girl was buried? A. Yes, sir. Q. You had a conversation with her that day in which she asked you if they knew what had happened and then told you that this girl had miscarried? A. Yes, sir. Q. And then you asked her who they thought was the father of the child? A. Yes, sir. Q. Then did she state that they had accused this defendant of it and that he had admitted it to Calvin Lane? Objected to by defendant as conversation not being in the presence of the defendant, which objection was by the court overruled, to which ruling of the court the defendant excepted at the time? A. Yes, sir."

The above statement we think is a full and fair setting out of the facts both for and against defendant. Other matters necessary to a more full understanding of the case will be hereafter referred to in the opinion.

OPINION.

We have not been furnished by the defendant with any brief or assignment of errors, so we must perforce turn to defendant's motion for a new trial for such assignment of error as may be necessary to an examination of the record. This we are Assignment bound to do by reason of the very plain of Errors. requirements of section 5312, Revised Statutes 1909, and if upon this examination we find reversible error we are equally bound to reverse the case.

I. The first complaint found in the motion for a new trial has to do with the sufficiency of the evidence. Points one, two and three in this motion are each di-

**Sufficiency of Evidence.** rected toward this question. The unbiased examiner will see that this is a very serious question. Much of certainty of guilt is lacking in the record before us; and at this distance, with nothing before us but the cold record, absent the witnesses in the flesh, their manner on the stand and of testifying, their several characters, their relations to and feelings for or against the defendant, and other questions weighing no doubt with the triers of fact, it is a little difficult to say that defendant's guilt was proven beyond a reasonable doubt. The inference looms large upon the facts that the calomel purchased by defendant might have cut some figure in this case. But while the proof was at hand, and while physicians who must have known the therapeutical properties of calomel were on the stand, yet they were not asked what effect, if any, the **Calomel to Pregnant Woman.** administering of this well-known drastic drug would, or might, produce in a pregnant woman. We take it that we cannot judicially notice the minute details of its medicinal properties in the behalf in question, if any it has. However, we cannot say upon the record that there was such absence of proof as would justify us in reversing the case for this reason. We appreciate the vast difference between the manner in which the case was presented to the jury and that in which it comes to us. In the light of the holdings of this court we are not disposed at this time to interfere with the view taken by the triers of fact. Testimony but a little stronger if any than that which is here before us has been held sufficient in this and other states. [State v. Smith, 190 Mo. 706; State v. Williams, 149 Mo. 496; State v. Tetrick, 199 Mo. 104; State v. Dickson, 78 Mo. 438; State v. Icenbice, 126 Iowa, 16; People v. Darr, 3 Cal. App. 50.] We are not saying that there was not sufficient showing of a *corpus delicti.* That the girl Naomi was under four-

teen years of age when she gave birth to the child is uncontradicted. That some person had had sexual access to her we must from the facts judicially notice. Therefore a *corpus delicti* is, in our opinion, sufficiently established.

It is only touching the proof of the *corpus delicti* that we have spoken. This may be said to consist of two things: (a) a criminal act; (b) the defendant's agency in the production of the act. [State v. Dickson, supra, quoting Wharton's Crim. Ev., sec. 325, and cases cited.] Notwithstanding all of this, if the questions here were solely upon the sufficiency of the evidence, we do not say that we should interfere with the verdict of the jury under the facts. So, on the whole, we rule this point against the defendant.

II. Defendant complains that the instructions given by the court on behalf of the State were improper. We have carefully gone over the instructions complained of, and while it may be said that they lack the fullness of words usually found in instructions upon the phases involved, yet we think that all necessary elements, both of charge and exception, are set out therein. No complaint is made of the failure of the court to instruct on all of the law and phases of the case. Upon an examination of the instructions we cannot say but that the court did so instruct, even though this point had been raised, as it was not. The sole complaint is that all of the instructions given, both for the State and the defendant, were erroneous. As stated above herein, the court gave the defendant the full benefit of whatever good reputation he may have shown by the facts proven; it sufficiently instructed upon the presumption of innocence, the burden of proof and reasonable doubt. No good will be subserved by setting out any of these instructions. We find nothing therefore in this point raised by defendant.

*Instructions.*

III.  The fifth and sixth points we shall consider together.  These are in brief (a) that the court erred in refusing to admit material testimony offered by the defendant (but an examination of the whole record fails to bear out this contention of defendant); (b) The other complaint is that the court erred in admitting irrelevant, incompetent and immaterial testimony on the part of the State over and against defendant's objections.  No specifications of error in the latter behalf occur in the motion for a new trial.  We are left, as we concede it to be our duty to do, guided by the motion for a new trial to go ourselves through the record and to examine the testimony piece by piece in order to see if this contention be well founded.  So doing, we find the state of facts illustrated by the excerpt of the testimony of Mrs. M. E. Bowen, the mother

Contradicting Witness: Extraneous Statement.

of the defendant, which we have set out in the statement.  The court permitted this witness to be asked this question: "Q.  I will ask you if she [Mrs. Ellen Burnham] didn't ask you if they knew who the father of this child was, and you told her that Naomi was not keeping company with anyone, but that it was laid on Ed Bowen, and that Ed Bowen had admitted to Calvin Lane that he was the father of the child?  Objected to by defendant as hearsay evidence, which objection was by the court overruled, to which ruling of the court defendant excepted at the time.  A.  No, sir, I didn't say anything like that."  In rebuttal Mrs. Ellen Burnham was called by the State and after stating that she was acquainted with Mrs. M. C. Bowen, she was further asked: "Q.  You had a conversation with her that day in which she asked you if you knew what had happened and then told you that this girl had miscarried?  A.  Yes, sir.  Q.  And then you asked her *who they thought* was the father of the child?  A.  Yes, sir.  Q.  Then did she state that they had accused this defendant of it and that he had admitted it

to Calvin Lane? Objected to by defendant as conversation not being in the presence of the defendant, which objection was by the court overruled, to which ruling of the court the defendant excepted at the time. A. Yes, sir.''

The admission of this testimony is sought to be justified by the State upon the theory that it was offered for the purpose of contradicting Mrs. Bowen. However, an examination of Mrs. Bowen's testimony will disclose that neither the question nor the answer complained of by defendant has any tendency whatever to contradict any statements theretofore sworn to by Mrs. Bowen. The question complained of was literally lugged into the case by its very ears, and could have had no other effect except to prejudice the defendant. Calvin Lane to whom the alleged admission of Ed Bowen is said by the question to have been made, was a witness in the case and doesn't testify to any such fact. The question is not directed toward a contradiction of anything that the witness Mrs. Bowen had sworn to. In fact, she swore to no facts which are not abundantly shown by a half dozen other witnesses. She had not hurt the State; nor had she helped defendant, except inferentially by statements indicating the presence of a mob spirit at the graveyard. That a witness may be impeached by a showing that the testimony in court is different from some statement made by the witness out of court is fundamental; but before this can be done the witness must have testified to a state of facts which the alleged impeaching question in somewise contradicts. The rule has been announced by a well-known writer in the following words: ''The two statements, however, must conflict in some way. The one made out of court must be inconsistent with some fact stated by the witness in his testimony, or with its general drift.'' [Rapalje on Witnesses, sec. 203, p. 339.] The rule stated in Missouri has been couched in terms almost identical

with the words quoted above. [State v. Hughes, 71 Mo. 633.] Cases are not lacking in this State in which witnesses have been impeached by a showing that they made other and different statements outside of court, but the statements made outside of court must be such as either in their substance or general drift contradict the statements made by the witness on the stand. An examination of Mrs. Bowen's testimony discloses that the alleged impeaching question asked her did not in anywise tend to contradict a single word that she had uttered while on the stand. It was a conversation between the witness Mrs. Bowen and the witness Mrs. Ellen Burnham had outside of the hearing and presence of defendant. "The law," says GANTT, J., in the case of State v. Newcomb, 220 Mo. l. c. 63, "is so well-settled that the defendant cannot be bound by statements and acts of third parties made out of his presence that it needs no citation to establish it, but our own reports abound in decisions condemning the admission of such testimony. [State v. Jaeger, 66 Mo. l. c. 180; State v. Rothschild, 68 Mo. 52; State v. Patrick, 107 Mo. l. c. 152.]"

We concede that it often occurs (indeed, the books are full of such) that an impeaching question, properly admissible, will do by its terms or inferences great harm before the jury to the defendant's case. Such in a proper case is merely defendant's misfortune. But that is not the question here, nor is that the vice of the situation presented. The witness Mrs. Bowen had never even been asked if she knew who the father of the child was. She had been asked "If *they knew*" this fact—drawing thus by inference upon bald rumor, and making the antidote more hurtful than the poison. Especially, was she not asked whether she had heard defendant admit his paternity thereof; nor whether she had heard him discuss such paternity; nor whether she had heard *the* alleged conversation of defendant with Calvin Lane; nor even

*any* conversation of her son with said Lane. Going further, though the statement is not pertinent to the rule enunciated, it may be said to be clearly inferable that Mrs. Burnham was mistaken, for though the alleged conversation was said to have been made to and in the presence of one Calvin Lane, the said Calvin, though he testified, does not relate any such state of facts. We conclude, therefore, that the question and its answer, and the question and answer propounded to Mrs. Burnham, were inadmissible; that the objections of defendant, though lacking in artificial definiteness and certainty, should have been sustained thereto, and that the court having failed to so sustain such objections committed error which prejudiced defendant in the jury's presence, and for which this case ought to be reversed. We are not saying that a foundation might not have been laid, or that a state of facts might not have been shown, which would render unobjectionable these questions and answers, but we are saying that on the record before us no such foundation was laid and no such state of facts shown.

Except for the error noted, the case was well tried; but since we deem the matter last adverted to prejudicial, we think this case ought to be reversed and remanded, and it is so ordered. *Brown, P. J.,* and *Walker, J.,* concur.