In the Matter of the Petition of HENRY C. DAVIS, as General Guardian of ELIZABETH LOUISE DAVIS, an Infant under the Age of Fourteen Years, to Obtain a Determination of the Rights of Said Infant under the Provisions of the Will of STEWART B. WELLS, Deceased.

Surrogate's Court, Westchester County, April 27, 1927.

Wills — construction — testatrix established trust for " grandchildren living at the time of my decease "— child, conceived prior to death of testatrix, entitled to partake of fund — testatrix died May 22, 1922 — evidence established infant petitioner was conceived May 1, 1922 — evidence — presumption as to conception.

Under a provision in a will  establishing a trust for " grandchildren living at the time of my decease," a child conceived prior to the death of testatrix is entitled to partake of the trust fund.  The testatrix died on May 22, 1922, and the evidence established that a grandchild, the infant petitioner herein, was conceived May 1, 1922.

There is a presumption that a child is conceived nine months, or 280 days, before its birth, and when the child is a product of marital relations, the presumption is that conception came through intercourse by the husband.  When no evidence is offered to rebut this presumption, it becomes conclusive.

Authorities collated and discussed on the question of conception.

PETITION by general guardian to obtain determination of rights of infant under a will.

*Greene & Hurd [George L. Hubbell, Jr.,* and *Daniel D. Farr* of counsel], for the petitioner.

*Earl D. Deremer,* for Lemuel E. Wells, Lemuel Stewart Wells and Blanche M. Wells.

*James G. Bagg,* special guardian for Stewart Beaver Wells and Francis B. Wells, infants.

*Frederick B. Van Kleeck,* special guardian for petitioner and Barbara Berkey, infants.

SLATER, S. Mrs. Stewart B. Wells died a resident of Westchester county May 22, 1922, leaving a will which was duly probated September 8, 1922. This is a proceeding for the construction of her will. The opinion will have occasion to refer to the 9th, 10th, 11th and 13th paragraphs of the will, which are as follows:

" *Ninth.* I give and bequeath to William Newman, the use during his natural life, of my house on West Mahonig Street, Danville, Pennsylvania, conditionally on his personal occupancy of it, keeping it in repairs and paying for same; paying all taxes and assessments which may become liens thereon and annually delivering to my executors receipted bills showing such payments. At the decease of said William Newman, I direct my executors to sell and dispose of said house and divide the proceeds arising therefrom equally among my grandchildren then living and the issue of any who may have died, *per stirpes* and not *per capita.*

" *Tenth.* All the rest, residue and remainder of my estate both real and personal I give devise and bequeath to my Executors, in trust nevertheless, and direct said Executors to divide said estate into as many equal parts as I may have grandchildren living at the time of my decease, and to invest and keep invested each of said equal parts of my said estate in such securities as they in their discretion may consider proper and to accumulate the income arising from each of said equal parts and to pay over one of said equal parts and the accumulations thereto to each one of my said grandchildren when he or she arrives at the age of twenty-one years.

" *Eleventh.* Should any one of my said grandchildren die before arriving at the age of twenty-one years then and in that event I give said one equal part and its accumulations which he or she would have received on arriving at the age of twenty-one years to such of my said grandchildren as may then be living."

" *Thirteenth.* I authorize my said Executors to use any part or all of the principal and accumulations of any one of said equal parts of said trust funds for the support of any one of said beneficiaries if in their opinion it would be advisable to do so."

There are five grandchildren of the testatrix at the present time, four of whom were born several years prior to her death, and one, the petitioner, Elizabeth Louise Davis, who was born eight months and fourteen days after the death of the testatrix, namely, February 6, 1923.

The petitioner and Barbara Berkey are half-sisters and the children of Elizabeth Davis, a daughter of the testatrix; Lemuel E. Wells, Francis B. Wells and Stewart Beaver Wells are children of Thomas Wells and Lemuel Stewart Wells, sons of the testatrix.

The court has appointed two special guardians, one for the petitioner and her half-sister, Barbara Berkey, and one for the infants cousins of the petitioner, because the parents of these infants are not in agreement upon the law governing the case.

Two questions of law are presented. The first question is: Whether under the terms of paragraph " tenth " of the will the grandchild Elizabeth Louise Davis would, if in being at the time of the death of her grandmother on May 22, 1922, partake of the fund provided for by that paragraph; in other words, would such child come within the meaning of the word " living " as used in said paragraph?

The second question is whether said grandchild, Elizabeth Louise Davis, was in being on May 22, 1922; had conception of such child taken place prior to the date of the death of the grandmother?

The 9th paragraph of the will gives to a life tenant certain property in Pennsylvania, and says: " at the decease of said William Newman, I direct my executors to sell and dispose of said house, and divide the proceeds arising therefrom equally among my grandchildren *then living*, and the issue of any who may have died."

The 10th paragraph of the will deals with the remainder and creates a trust, directing that the residue shall be divided " into as many equal parts as I may have grandchildren *living at the time of my decease*."

The 11th paragraph states that, should any one of said grandchildren die before arriving at the age of twenty-one years, the corpus of the trust and its accumulations which such grandchild would have received on arriving at twenty-one years shall pass to " *such of my said grandchildren as may then be living*."

The respondents refer to the fact that a clear distinction is made by the testatrix between the class as designated in the above noted paragraphs of the will, and claim it was the intention of the testatrix to limit the gift in the 10th paragraph to the grandchildren as designated in the 11th paragraph. The court holds that the testatrix must be charged with the fine discrimination of the draftsman in the employment of words, as she created the several paragraphs carrying the gifts. The context of the will discloses that the testatrix knew exactly what she wanted to do and evidenced it by a clear intention in the use of her varying words. (*Matter of O'Dell*, 124 Misc. 76.) There is no ambiguity in the language used in these several paragraphs. The draftsman was a lawyer who knew the meaning and force of legal terminology and we find him using words with some exactness. (*Matter of Parsons*, 242 N. Y. 246. 250.) These paragraphs are expressed in language

29

concerning which there can be no misunderstanding. Why the distinction was made in referring to " grandchildren living at the time of *my decease* " in the 10th paragraph, and to " grandchildren as may *then be living* " in the 11th paragraph does not concern the court. The expression is clear in each paragraph. These words should be given their ordinary meaning, and cannot be rejected as meaningless or repugnant. (*Matter of Buechner*, 226 N. Y. 440; *Matter of Parsons*, 124 Misc. 394; affd., 214 App. Div. 802; mod. and affd., 242 N. Y. 246.)

The respondents made offer of extrinsic evidence by the draftsman of the will which the court refused to take. Evidence of extrinsic circumstances may sometimes assist the court in the construction of language which a testator has used to express his testamentary intention; but here the language of the will, even when read in the light of extrinsic circumstances, admits of but one construction. Parol evidence is not admissible to show that the testatrix did not mean what she has said in words, though these words may have been chosen by the attorney who drafted the will, rather than by the testatrix. (*Reynolds* v. *Robinson*, 82 N. Y. 103; *Dwight* v. *Fancher*, 245 id. 71.)

It is the court's opinion that the testatrix did not by her use of the words " living at the time of my decease " limit the class of grandchildren to take under the 10th paragraph to those whom she knew had been born at the time of her death. In paragraph " tenth " she selected a different time for the determination of the class, that is, the date of her death. She had a right to do so. She did it in plain understandable language. Therefore, if the petitioner, Elizabeth Louise Davis, was " living " at the date of her grandmother's death, she takes under the 10th paragraph of the will.

On May 22, 1922 (the date of the death of the testatrix herein), Elizabeth W. Davis and her husband, Henry C. Davis, were residing at Santo Domingo, where he was stationed as a Lieutenant-Colonel in the Marine Corps. Colonel and Mrs. Davis were living under the same roof, and occupied the same bed. The husband had not been absent from his home overnight at any time between March 25, 1922, and May 25, 1922. On May 23, 1922, Colonel Davis received a cablegram from Danville, Penn., conveying the news of the death of the testatrix, which had occurred the previous day. The boat having sailed from Santo Domingo on May twenty-second, Mrs. Davis left her home at Santo Domingo on the morning of May 25, 1922, by way of Monte Christo, on the north coast of the island, for the purpose of intercepting the boat at another place. At the time of her leaving her husband at Santo Domingo

she had passed her normal, or usual catamenial period by about ten days.

If the petitioner was conceived prior to the death of the testatrix, she was " living " on May 22, 1922.    The word " living " is defined by the lexicographers as meaning " having life, the state or quantity of being alive."    It is well settled that a child *en ventre sa mere*, which is subsequently born alive and capable of living, is considered a child living so as to take a beneficial interest in a bequest or devise where the description is " child living." (*Doe* v. *Clarke*, 2 H. Black. 399; *Trower* v. *Butts*, 1 Sim. & Stu. 181; *Clarke* v. *Blake*, 2 Ves. Jr. 673; *Hone* v. *Van Schaick*, 3 Barb. Ch. 488; revd., on other grounds, 3 N. Y. 538; *Hall* v. *Hancock*, 32 Mass. [15 Pick.] 255; *Dexter* v. *Attorney General*, 224 id. 215, 218; *Cowles* v. *Cowles*, 56 Conn. 240, 247; *Mason* v. *Jones*, 2 Barb. 229; *Stedfast* v. *Nicoll*, 3 Johns. Cas. 18; *Marsellis* v. *Thalhimer*, 2 Paige, 35; *Jenkins* v. *Freyer*, 4 id. 47; *Cooper* v. *Heatherton*, 65 App. Div. 561; *Quinlen* v. *Welch*, 69 Hun, 584; *Matter of Voight*, 178 App. Div. 751; *Matter of Farmers' Loan & Trust Co.*, 82 Misc. 330, 336; *Matter of McEwan*, 202 App. Div. 50; Real Prop. Law, § 56; *Matter of Salaman*, 1 Brit. R. C. 587; 77 L. J. Ch. [N. S.] 60; 98 L. T. N. S. 255; 21 Harv. Law Rev. 360; 2 Jarman Wills [6th Eng. ed.], 1701, 1702; *Hewitt* v. *Green*, 77 N. J. Eq. 345; *Petway* v. *Powell*, 22 N. C. 308; *James* v. *James*, [Tex. Civ. App.] 164 S. W. 47; *Thornton* v. *Zea*, 22 Tex. Civ. App. 509.)

In *Trower* v. *Butts* (1 Sim. & Stu. 181) the court was of the opinion that a child *en ventre sa mere* is to be considered a child living so as to take a beneficial interest in a bequest where the description is " children living " (*Long* v. *Blackall*, 7 T. R. 96); or under the Statute of Distributions (*Wallis* v. *Hodson*, 2 Atk. 115, 117; *Thellusson* v. *Woodford*, 4 Ves. 227, 322; *Doe* v. *Lancashire*, 5 T. R. 49) and generally for all purposes where it is for his benefit.

In *Hall* v. *Hancock* (*supra*) the will gave property to the grandchildren, the children of two daughters; that is to say, to such of them " as may be living at my decease."    The issue created was whether Charles L. was living at the decease of the testator.    The testator died June 19, 1809, and Charles L. was born March 6, 1810.    The jury were instructed that, in the absence of facts proving the birth was premature, the legal presumption was that the child was *in esse* at the time of the death of the testator. (Opinion by SHAW, Ch. J.)    " The claimant being born within nine months after the death of the testator, the question is, whether he was then living, within the meaning of the law, so as to be entitled to a share.    In the first place, we think the jury were rightly instructed, that a child is to be considered *in esse* at a period commencing nine

months previously to its birth, and where there is not evidence to rebut the presumption, it is conclusive. * * * A child *en ventre sa mere*, even in the early stages of pregnancy, should be deemed living, because the potential existence of such child places it within the reason and motive of the gift. And the maxim of the civil law was cited, *posthumus pro nato habetur*."

*Dexter* v. *Attorney General* (224 Mass. 215) also held that any issue of Georgianna Musgrave, a niece of the testatrix, born within nine months after the death of the last life tenant are to share the fund.

In *Cowles* v. *Cowles* (56 Conn. 240, 247) the testator died on the 17th day of January, 1886, and a grandchild was born on the 20th day of July of the same year, raising the question: Does the grandchild born after the death of the testator take any share in the residuary estate? The court says: " A child is considered in being from the time of its conception, where it will be for the benefit of the child to be so considered. Its conception is presumed to have occurred nine months previous to its birth, and where there is no evidence to rebut the presumption, it becomes conclusive."

Posthumous children are placed on the same footing with respect to property devised and to property coming by descent as other children of the same parent. (*Mason* v. *Jones*, 2 Barb. 229, 251; Decedent Estate Law, §§ 93, 98, subd. 14.) This is upon the principle that a child *en ventre sa mere* shall be considered *in esse* for most purposes of property. (2 Jarman Wills [6th Am. ed.], 196.)

In both England and the United States the result to include a child *en ventre sa mere* seems now to be uniformly reached when the devise runs to children or grandchildren as a class; to a son; or to one living at a particular time. It is to the child's benefit to hold him born. When it is detrimental to the child to regard him as born, two American courts have not included him — Virginia and Pennsylvania. (*Armistead* v. *Dangerfield*, 3 Munf. [Va.] 20; *M' Knight* v. *Read*, 1 Whart. [Penn.] 213.) In view of the rareness of the cases in which it is not for the child's benefit to hold him born, and of the inaccuracy attendant on attributing to testator's intentions in regard to circumstances obviously unforeseen in the will, it would seem on the whole better to consider a child *en ventre sa mere* as born. (21 Harv. Law Rev. 360.)

A doubt did at one time exist as to whether the children would take who come under the description of children " born; " but that question also has been determined in favor of the child.

Was Elizabeth Louise Davis conceived and living prior to the date of her grandmother's death on May 22, 1922?

Upon the hearing the court permitted the respondents to present testimony of a physician, a medical expert in obstetrics, for the purpose of disclosing his professional or scientific knowledge, which was not within the range of ordinary training or intelligence, for the purpose of aiding the court. In general, expert opinion evidence is admissible upon any subject which, in the discretion and judgment of the trial court, will be made clearer by its introduction. (*Ferguson* v. *Hubbell*, 97 N. Y. 507, 513; *Dougherty* v. *Milliken*, 163 id. 527; *Weibert* v. *Hanan*, 202 id. 328, 331.)

" The law may reject testimony which appears to be founded on data so scanty that the witness' alleged inference from them may at once be pronounced absurd or extreme. * * * When the source of knowledge is so insufficient, courts will rarely need to pronounce the formal exclusion of the testimony." (1 Wig. Ev. 755, § 659.) And further, in section 662, the same author says: " Sometimes the exclusion has rested, not wholly on the impossibility of knowing the matter, nor yet wholly on the insufficiency of the particular witness' data of inference, but on mixed grounds, amounting to this, that the subject is one in which certain and accurate results are difficult to reach and upon which most persons' opinions will be merely notional and conjectural, so that it is not worth while to listen to testimony at all."

Conception in its obstetric sense means the union o˚ the male and female elements of procreation, from which union a new being is developed. It is the means for the propogation of the human species.

The testimony of the medical expert offered by the respondents regarding the time of conception was to the effect that the medical profession is in a position of uncertainty, and its only recourse now is to guess at the exact date. The possibility that conception could have taken place later than May 22, 1922, is advanced by the respondents. Upon the doubt created by the medical expert, the respondents are relying to sustain their contention.

There are three theories as to the time when conception may take place. The medical expert testified that it was impossible to establish any absolute rule as to the length of the period of gestation; that there was a rule to count from the beginning of the last menstrual period, and that it varies anywhere from 252 to 260 days, from 265 to 280 days. The oldest theory is that ovulation occurred every month coincident with menstruation, and that the pregnancy supervened directly after menstruation; pregnancy being established the instant the menses did not appear. A newer theory of Reichert is that conception takes place prior to the menses that are coming, or that should come. Another theory by Frankel

and other eminent physicians is that the cell from the woman is discharged from the ovary about 14 to 16 days after menstruation takes place. These three theories account for the variation of days as the period of gestation. Most text-books, the expert testified, will state the period of gestation, or when conception takes place is unknown, and has never been definitely proved, and is every man's theory.

Consequently, because of this indefiniteness in the medical profession, the courts fall back upon the ordinary length or duration of the period of human gestation of 280 days as a phenomena of life as a matter of common knowledge of which the courts will take judicial notice. (*People* v. *Farina*, 134 App. Div. 110; *Erickson* v. *Schmill*, 62 Neb. 368; *State* v. *Drummins*, 274 Mo. 632; 204 S. W. 271; *Davis* v. *State*, 20 Ala. App. 463; 103 So. 73; *Eddy* v. *Gray*, 86 Mass. [4 Allen] 435; Coke Littleton, 123 *l.*; 2 Greenl. Ev. [16th ed.] 135; *State* v. *Arnold*, 267 Mo. 33.)

The Modern Law of Evidence by Chamberlayne (Vol. I, § 770) says: " Notorious facts concerning the frame of the human body, the usual limits of time within which its gestation normally takes place, the average length of human life at the present time, * * * need not be proved." The range of extraordinary gestation needs proof. (*Erickson* v. *Schmill, supra.*) That means in excess of 280 days.

Jones Evidence (3d ed. § 129) says: " Judicial notice will be taken of facts which must invariably happen in the course of nature, such as * * * the laws governing birth, as that one is not the father of a child when non-access is proved until insufficient time before the birth."

23 Corpus Juris, 146, says: " Well-known facts concerning the phenomena of human life in its various forms need not be proved. Thus, courts take judicial notice that some person had sexual access to a woman who gave birth to a child; of the ordinary period of gestation." (Citing *Hoagland* v. *Canfield*, 160 Fed. 146; *State* v. *Bowen*, 247 Mo. 584; *State* v. *Sexton*, 10 S. D. 127; 11 id. 105; *State* v. *Greene*, 38 Utah, 389.)

So in *Whitman* v. *State* (34 Ind. 360) the child was born on the 3d day of June, 1869. Counting back from this time the ordinary period of gestation fixed the date on which the child was probably begotten as about the 1st of September, 1868. The court says, quoting from Wharton and Stille's work on Medical Jurisprudence (§ 305), the organs of conception, like those of digestion, perform their appropriate offices without the volition of the female. She is not conscious at the moment of the occurrence of what has taken place.

In Jones Commentaries on Evidence (Vol. I [2d ed.], § 456) the author writes: Courts notice generally the period of human gestation which, according to Lord Coke, is recognized by the law of England as forty weeks.   (In note, cites *Matter of McNamara*, 181 Cal. 82; *Whitman* v. *State*, 34 Ind. 360; *Eddy* v. *Gray*, *supra*; *Erickson* v. *Schmill*, *supra*; *People* v. *Farina*, *supra*; *The King* v. *Luffe*, 8 East, 193, 202; *Heathcote's Divorce Bill*, 1 Macq. 277;  Taylor Evidence, § 16.)

In *People* v. *Farina* (*supra*), Judge WOODWARD remarks: " Courts will judicially notice the ordinary period of human gestation (*The King* v. *Luffe*, 8 East, 193), and according to Lord Coke the period by the law of England is fixed at forty weeks, and the present doctrine seems to be in harmony with this view."   (3 Am. & Eng. Ency. of Law [2d ed.], 884, and authorities there cited.)

The testimony of Dr. James H. McDuffie, Jr., the attending physician, from his official record, occasioned by examination of, and statements made to him on September 19, 1922, by the mother, was that she had her last menstrual period April eighteenth and had a " showing " April thirtieth.   Taking April thirtieth as the period of last menstruation, as Dr. McDuffie did, we find 282 days intervened between that time and the date of birth.

The physician's testimony was taken by commission in Columbus, Ga., where the petitioner was born.   He testified that the mother called upon him on September 19, 1922, and once monthly thereafter until delivery; that he attended the delivery, and that the child was a normal, healthy child in delivery, and he observed nothing in the condition of either the mother, or the child, during the periods concerning which he testified, that would indicate that the petitioner was born before the normal period of gestation. Copies of his obstetrical slips were annexed to the commission and show that the mother stated that she had menstruated a little irregularly twice in April, 1922, the first time about the eighteenth, for nearly three days, and again on April 30, 1922.   He says: " My ante-partem examination records on January 9th, 1923, show the diagnosis of a pregnancy of 8 months, position of fetal heart normal, rate 140, vertex presentation, and a right occiput interior position, tending to show that the patient would be delivered in about one month from January 9th, 1923."

Taking the 280 days as the normal period of gestation, counting back from the date of birth — February 6, 1923 — will make May 2, 1922, the probable date of conception of Elizabeth Louise Davis.

The Naegle method of ascertaining the probable date of birth is by counting back three months from the last menstrual period,

and add seven days. ₒ This method would bring the probable date of birth as it actually was, February 6, 1922.

Another method observed by the medical profession in ascertaining the date of conception and probable birth is noting the date of quickening. In the instant case, the quickening was September 11, 1922, as disclosed to the physician by the mother. The usual time for quickening to occur is four and one-half months from date of conception. Dating back four and one-half months, or 135 days, from September 11, 1922, makes the date of conception May 1, 1922.

The medical expert was asked the questions: " If it is an established fact that quickening occurred September 11th, did conception take place four to four and a half months prior thereto? " Answer: " Yes."

Also, the question: " A woman says she was sick on a certain day, and you figure 280 days from that date, would you strike the date of birth? " Answer: " Approximate date of birth."

· Dr. McDuffie, in answer to a question propounded, testified: " The dates given in the history of the last menstruation, the normal time for the observance of a quickening, and the normal ante-partem examination one month before delivery showing an eight-months pregnancy, the normal course of the pregnancy, the normal date of the delivery, and the exact calculated date of confinement, and the normal condition of the child at birth show conclusively that Mrs. Davis' pregnancy and confinement were of an absolutely normal nature."

It would appear that the courts have not been unwise in taking judicial notice of the phenomena of life, and the period of gestation as 280 days.

The respondents contend that, as conception could have taken place after May 22, 1922, if some of the medical theories could be proved correct, the burden of proof to establish the fact of conception prior thereto has not been sustained by the petitioner. A disputed medical theory impossible of proof is not evidence to rebut a presumption of law.

There is a presumption that a child is conceived nine months, or 280 days, before its birth, and when the child is a product of marital relations, the presumption is that the conception came through intercourse by the husband. When no evidence is offered to rebut this presumption, it becomes conclusive. (*Hall* v. *Hancock, supra; Dexter* v. *Attorney General, supra; Cowles* v. *Cowles, supra.*)

The facts in the case of *Hall* v. *Hancock* (*supra*) are almost identical with those in the instant case. The question of law and the attack upon the facts as made herein was not made, argued or

decided in the *Hail* case. There a certain estate was given to the children of daughters, to such of them " as may be living at my decease." It was proved at the trial that the child was born on March 6, 1810, 8 months and 17 days, or 261 days after the testator's death. The jury was instructed that, in the absence of evidence, the birth was premature; the legal presumption was that the child was *in esse* at the time of the death of the testator; that the jury was rightly instructed, and that, there being no evidence to rebut the presumption, it was conclusive.

The respondents have proved nothing by the medical expert, except doubt. They have proved that doubt and mystery had existed during the ages, and still exists, with regard to the accurate period of conception of children. They proved the wisdom of the acceptance of the phenomena of life by the courts.

The court has developed this opinion with more amplification than may be necessary, because, so far as it can find, or has been brought to its attention by the research of counsel, there is no other case in the law books dealing with the question of conception as raised in the instant case.

I find upon the facts of the case, and as a matter of law, that Elizabeth Louise Davis was a child *en ventre sa mere* on May 22, 1922, subsequently born alive and capable of living, and was and is a living child for all purposes pertaining to her property rights under her grandmother's will; that she was conceived on May 1, 1922, prior to the death of the testatrix.

Submit a decision in conformity to these views upon notice to attorneys appearing and special guardians appointed.

A decree may be entered thereon declaring the said Elizabeth Louise Davis to be entitled to a one-fifth interest in the trust fund, together with the income which has accrued thereon, created by the 10th paragraph of her grandmother's will, and that the trustees be directed to enter a final account of their proceedings as such trustees; that the trustees be instructed to set up a fund for the benefit of said Elizabeth Louise Davis in an amount equal to one-fifth of the corpus of the trust, together with one-fifth of the income created thereon.