THE STATE v. SAM STEVENS, Appellant.—29 S. W. (2d) 113.

Division Two, June 11, 1930.

*Barney Reed* and *H. M. Atwell* for appellant.

436

*Stratton Shartel*, Attorney-General, and *Don Purteet*, Assistant Attorney-General, for respondent.

HENWOOD, C.—By an information filed in the Circuit Court of Miller County, the defendant and John Irwin were jointly charged with statutory rape, that is, with carnally knowing Mary Lou

Monroe, a female child under the age of sixteen years. The defendant took a severance, was found guilty and sentenced to imprisonment in the penitentiary for two years, and, in due course, appealed.

The prosecutrix testified: On March 21, 1929, the time in question, she was between fourteen and fifteen years of age, living at the home of Mrs. Berry Watt in the town of Eldon, in Miller County, and working in a factory in Eldon. In the evening of March 21, 1929, she and Mrs. Watt and Mrs. Watt's daughter, Bernice, attended church services at the Nazarene Church in Eldon. The defendant and Irwin were there. She left the church building and started home with Mrs. Watt and Bernice about ten o'clock. A short distance from the church building, she saw the defendant and Irwin across the street. They called her across the street and asked her to take a ride with them in an automobile truck. She declined. The defendant told her to get into the truck and that he would take her to her home. After she got into the truck, they refused to take her to her home. They drove south several miles, in Miller County, in the direction of the town of Bagnell. They stopped first at Aurora Springs Park. Irwin exhibited a pistol and told her he knew how to use it. The defendant pulled her out of the truck, threw her on the ground, got on top of her, and had sexual intercourse with her. Irwin held her while the defendant had sexual intercourse with her. They put her into the truck, and drove to the railroad trestle south of Aurora Springs. They stopped there, and the defendant, with Irwin's help, pulled her out of the truck. Irwin held her while the defendant had sexual intercourse with her. Then the defendant held her while Irwin had sexual intercourse with her. They drove back to Eldon, and she got out of the truck about one block from her home. The next day, she told Charlottie Craig, Pearl Watt, Dr. G. D. Walker and H. W. Scott, a justice of the peace, "what happened." On cross-examination, she admitted she "put" her age at "sixteen" when she went to Eldon to obtain employment. She said she did this because she "couldn't work" if she "didn't."

We will hereinafter refer to certain testimony of the prosecutrix which was admitted over the objection of the defendant.

The State offered in evidence the "Family Record" of the Monroe family, which shows that the prosecutrix was born "September 20, 1914," and several close acquaintances of her family testified that she was fourteen years of age at the time of the alleged offense.

The prosecutrix was corroborated, in some particulars, by Mrs. Watt, Bernice Watt, Dr. Walker and H. W. Scott. Mrs. Watt and Bernice said the prosecutrix went with them to the Nazarene Church on the night in question, and, on their way home, the defendant called the prosecutrix across the street, "talked to her a minute," then she and the defendant walked "towards" the

truck, which they saw going down the street shortly thereafter. Mrs. Watt also said the prosecutrix did not come home until after midnight. Dr. Walker said, "the day after the assault," the prosecutrix complained to him "that a rape had been committed," and requested "an examination of her sexual organ;" that he called Dr. E. C. Shelton, and they "made an examination together." Both said they found a normal vagina and no hymen; that the vagina had been entered, but they found no tears, lacerations, soreness, nor indications of a recently ruptured hymen; and that they were unable to say whether or not her sexual organ had been entered by the sexual organ of a man. "Squire" Scott said she complained to him about the alleged offense, and signed and swore to the complaint filed before him, on March 22, 1929.

The defendant, testifying in his own behalf, said: He was eighteen years of age, and lived on his father's farm, about one mile north of Eldon. He worked on the farm. He had known the prosecutrix two or three months, but was not with her during the evening or night of March 21, 1929. He had never had "a date" with her, and had never, at any time, had sexual intercourse with her. John Irwin is his cousin. Irwin lived in Jefferson City, where he drove a truck for the Capital Fruit Company. Irwin was with him on the evening in question, and stayed at his home that night. In the early part of the evening, he rode to the Nazarene Church in Eldon with Irwin in Irwin's truck, and Irwin parked the truck near the church building. He left Irwin outside of the church building when the services were "just about over" and did not see Irwin again until he went home, after midnight. He went to the picture show building, about one block from the church building, where he met Charlottie Craig and her cousin, Lucille Slavens. He had been "keeping company" with Charlottie Craig. He accompanied Miss Craig and Miss Slavens to Miss Craig's home in Eldon. They reached Miss Craig's home about 9:30 and he did not leave until twelve o'clock. He reached his home about 12:20, and found Irwin there "asleep."

In his defense of *alibi*, he was supported by Charlottie Craig, Lucille Slavens, Mrs. Walter Craig, mother of Charlottie Craig, and three other witnesses. Charlottie and Lucille said the defendant met them at the picture show building about nine o'clock, accompanied them to Charlottie's home, and stayed there until about twelve o'clock. Mrs. Craig said the defendant came to her home with Charlottie and Lucille between nine and 9:30 and did not leave until "sometime after 11:30." Another witness said the defendant left the church building alone and started immediately in the direction of the picture show building. Two other witnesses said they saw the defendant "walking along" the street with Charlottie and Lucille while they (the witnesses) were on their way home from the Nazarene Church.

The defendant offered in evidence the record of the employer of the prosecutrix, in which "Sep. 20, 1912" appears as the date of her birth; and one of the defendant's witnesses (Mrs. Minnie Justice) said she was a neighbor of the Monroe family at the time the prosecutrix was born, and that the prosecutrix was sixteen years of age at the time of the alleged offense.

Three of the defendant's witnesses said the reputation of the prosecutrix for morality was bad, and one of the defendant's witnesses said her reputation for morality was good.

In rebuttal for the State, two residents of the town of Proctor, in Morgan County, where the prosecutrix was born and reared, testified that her reputation in that community for morality and chastity was good.

I.  The challenge of the sufficiency of the evidence cannot be seriously considered.  The competent testimony of the prosecutrix and her corroborating witnesses is amply sufficient to support the verdict.  Convictions based upon proof of the same character have been upheld by this court in numerous cases.  [See State v. English, 11 S. W. (2d) l. c. 1022, and cases cited.]

II.  The complaint concerning the admission of certain testimony of the prosecutrix is well taken.

After the prosecutrix had testified that she and Pearl Watt left Eldon together, and that she (the prosecutrix) was not in Eldon "on the first day set" for the defendant's preliminary hearing, she was permitted to further testify, over the objection of the defendant, as follows:

"MR. FENDORF (prosecuting attorney): Did you receive any money before you left Eldon? A. Yes, sir.

"Q.  Did you know beforehand that you were going to receive that money? A. Not for sure.

"Q.  Did you expect to receive some money? A. Yes.

"Q.  When did you first know that you were going to get some money? A. When I went to the factory, Pearl Watt called me—

"MR. REED (defendant's counsel, interrupting): Was the defendant there? A. No.

"MR. FENDORF: You say you had a conversation with Pearl Watt at the factory? A. Yes.

"Q.  What did she say? A. She said somebody told her I would get some money they was sending—"

Then, after testifying that the defendant came to the home of Mrs. Watt and talked to Pearl Watt twice on the day she and Pearl left Eldon, the prosecutrix was permitted to further testify, over the objection of the defendant, as follows:

"MR. FENDORF: What did you do then—after Sam Stevens (the defendant) left the second time? A. Pearl and I started to town and up there at the Rock Island depot we saw Sammy's (the defendant's) lawyer across the street.

"Q. Did you talk to him? A. Yes.

"MR. REED: Was Sam Stevens present? A. No.

"MR. FENDORF: Then what was said at that time? A. Pearl said she was going to Chicago and if he would give her enough money to get up there and pay my way up there we would go, and Mr. Atwell said if they would fix it up and give us the money to go we would have to stay gone.

"Q. Was there anything else said at that time? A. Yes.

"Q. What was that? A. Mr. Atwell said for us to meet him some place and him and Sammy (defendant) would be there—I forget just where he said to meet them. Before time to go, Walt. Craig come over to Cooper's with the money.

"Q. And you were at Cooper's before Walter Craig came with the money? A. Yes.

"Q. Just tell the jury what Walter Craig said and did? A. Well, he said he had something for me, receive it or not, and I said I would receive it.

"Q. Did you receive it? A. Yes.

"Q. What was it? A. Some money.

"Q. When you were talking with Mr. Atwell state whether or not anything was said about somebody coming to see you in case you didn't keep the appointment. A. I don't remember it.

"Q. Anything said about if you didn't come to the place there some responsible man— A. (Interrupting) Yes, he said if he didn't come he would send some responsible person with the money.

"Q. You say you received the money from Walter Craig? A. Yes.

"Q. What was that in? A. A Skelly envelope.

"Q. What was in it? A. Sixteen dollars and something.

"Q. Well, I'll ask whether or not the amount corresponded with the fare to Chicago. A. Yes."

The prosecutrix admits that the defendant was not present when she talked to Pearl Watt at the factory, nor when she and Pearl talked to Mr. Atwell near the Rock Island depot, nor when she talked to Walter Craig at Cooper's. She says the defendant talked to Pearl on the same day, and shortly before she and Pearl talked to Mr. Atwell, but Pearl did not testify, and the proof fails to show what the defendant said to her on that occasion. And, while Mr. Atwell appeared as one of the defendant's attorneys at the trial of this case, it was not shown that he had been so employed at the time the prosecutrix says she and Pearl talked to him about leaving Eldon. There is no direct evidence, nor any evidence from which it may be reasonably inferred, that the defendant authorized either

Pearl Watt or Mr. Atwell or Walter Craig to speak or act for him in connection with the money transaction referred to by the prosecutrix, nor that this alleged money transaction and these alleged conversations were had with the defendant's knowledge and consent. Under such circumstances, the testimony of the prosecutrix relating to these matters was clearly inadmissible and, in view of the sharp conflict in the evidence on the issue of the defendant's guilt or innocence of the offense charged, it was highly prejudicial. Therefore, we must hold that the admission of this testimony, over the objection of the defendant, constitutes reversible error. [State v. Patrick, 107 Mo. 147, 17 S. W. 666; State v. Bowen, 247 Mo. 584, 153 S. W. 1033.]

III. It will suffice to say that no error was committed by the trial court in excluding the defendant's proof of specific acts of immorality of the prosecutrix, nor in refusing to modify the State's Instruction 2, as requested by the defendant.

IV. The other complaints in the motion for a new trial relating to given and refused instructions are general in character and do not specify wherein any error was committed in the giving and refusal of instructions. These complaints present nothing for our review. [Sec. 4079, Laws 1925, p. 198; State v. Standifer, 316 Mo. 49, 289 S. W. 856.]

V. The motion in arrest of judgment will be disregarded. Motions in arrest of judgment in criminal cases were abolished in 1925 and now have no place in our criminal procedure. [Sec. 4080, Laws 1925, p. 198.]

VI. We have examined the information, as a part of the record proper, and find that it is sufficient in form and substance. [Sec. 3247, Laws 1921, p. 284a; State v. Cason (Mo. Sup.), 252 S. W. 688, and cases cited.]

Because of the error of the trial court in admitting incompetent and prejudicial testimony of the prosecutrix over the objection of the defendant, the judgment is reversed and the cause remanded. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.