## THE STATE v. JAMES YANDELL, Appellant.

### Division Two, March 5, 1907.

1. **JURORS: Second Offense: Number of Challenges: Waiver.** Under the statutes a defendant who has previously been convicted of an offense punishable by imprisonment in the penitentiary "not less than a specified number of years," may upon a trial for a subsequent penitentiary offense be punished by imprisonment for life, and hence he is entitled to twenty peremptory challenges. But that is a right he can waive. And if he makes no objection to a panel of thirty, he cannot, after the jury of twelve has been sworn to try the cause, for the first time demand as a matter of right that it be discharged for the reason that he was entitled to twenty challenges but was allowed only twelve. Having failed to make his objection in time, he will be held to have waived his right to twenty challenges.

2. **INSTRUCTIONS: No Exceptions.** Where the instructions were not embraced in a bill of exceptions and no exceptions were saved to the giving of certain instructions set out in the record proper and alleged to have been given, the appellate court cannot consider the instructions on appeal.

3. **EVIDENCE: Admission and Exclusion: No Assignment in Motion.** Where no point is made by defendant in his motion for a new trial, in regard to the admission of improper evidence on behalf of the State, or to the exclusion of proper evidence offered by defendant, the admission or exclusion of evidence cannot be considered on appeal.

4. ———: **Weight of Evidence.** Where there is substantial evidence of defendant's guilt, the appellate court will not undertake to determine that a verdict of guilty is against the evidence in the case.

Appeal from Douglas Circuit Court.—*Hon. F. C. Johnston,* Special Judge.

Affirmed.

*J. S. Clarke* for appellant.

(1) The charge set forth in the information is "second offense" burglary and larceny (sec. 2379, R. S. 1899) and under such charge, if sustained by the evidence, the punishment must be imprisonment for life; hence defendant was entitled to his statutory challenge of twenty men instead of twelve. Sec. 1890, R. S. 1899. The degree or severity of punishment determines the number of peremptory challenges the defendant in any criminal case is entitled to, and such number is based solely on the charge in the indictment or information, and in determining the number of peremptory challenges the defendant was entitled to in this case, we only have to examine the information to find what the charge against him is, and what degree of punishment the State sought to inflict. It is obvious that the State sought to charge and prove an offense punishable solely by life imprisonment, and have thus far succeeded in such attempt. (2) After the jury was sworn to try the cause and had heard part of the evidence, the defendant could not consent, in this kind of case, to the discharge of juror Hale, and replacing him by one Martin without any preliminary qualifications as a juror. There is nothing to show that Martin was of the age of twenty-one years, that he was not of kin to the parties in interest, that he was a resident of the county of Douglas, or even State of Missouri. He was simply agreed upon by the State and defendant's counsel, to take the place of juror Hale

and was sworn to try the case in the usual way. A defendant in a criminal case may waive his statutory privileges concerning jurors, but not his constitutional rights. State v. Davis, 66 Mo. 684; State v. Meyers, 68 Mo. 266; Vaughn v. Scad, 30 Mo. 600. In prosecutions for felonies the defendant has the right "to a public trial by an impartial jury of the county." Sec. 22, art. two, Constitution of Missouri. As the juror Martin was not in any manner interrogated as to his qualifications as a juror, he may or may not have been even a resident of the county, which is a constitutional qualification and cannot be waived by defendant. If defendant could waive this right under the Constitution, then he could waive it in like manner to the full number of twelve persons. (3) The evidence to identity of the defendant is the certificate of the warden of the penitentiary, who claims to have received a James Yandell into the State prison on May 23, 1901. Nothing can be presumed against defendant in this sort of case. There was no certificate of the Webster County Circuit Court clerk attached to the judgment offered in evidence by the State, to prove former convictions in this court, the certificate being attached to the last one only. The one read to the jury being the first judgment, was not a certified copy and should not have been read to the jury. State must show judgment of former conviction. State v. Brown, 115 Mo. 409.

*Herbert S. Hadley*, Attorney-General, and *N. T. Gentry*, Assistant Attorney-General, for the State.

(1) In his motion for a new trial, defendant makes no mention of the admission of improper evidence for the State; neither does he complain of the refusal of the trial court to admit proper evidence for the defendant. Hence, the admission or exclusion of evidence can not be considered by this court. State v. Laycock, 141 Mo. 274. It may be stated, however, that the record of de-

fendant's former conviction of burglary and larceny, and his service of a term in and discharge from the penitentiary, were properly admitted in evidence; and the same showed that he was an habitual criminal. R. S. 1899, sec. 2379; State v. Carr, 146 Mo. 1. (2) The record wholly fails to show what, if any, instructions were asked or given in this case. So the question of the giving and refusing of instructions can not be considered by this court, especially as the defendant made no objections and saved no exceptions to the instructions at the time. State v. Eaton, 191 Mo. 157; State v. King, 194 Mo. 474; State v. Reed, 89 Mo. 171; State v. Morgan, 95 S. W. 402. (3) There is nothing in the record to show that defendant made any objections to the number of jurors on the panel till after the twelve were selected, or that he asked for additional jurors before making his challenges. The objection that he made to the number in his motion for a new trial was, of course, too late. State v. Waters, 62 Mo. 196; State v. Klinger, 46 Mo. 224. But it is insisted that, under the statute, defendant was only entitled to a panel of thirty men, which the record shows were qualified in this case. R. S. 1899, secs. 2619 and 2621. (4) Defendant's main contention seems to be that error was committed by the trial court in excusing juror Hale and in substituting in his place juror Martin. The record, however, shows that this was done by the consent of defendant; and the record nowhere shows that any objections were made thereto till he filed his motion for a new trial. While a defendant in a criminal case has certain statutory rights, yet he may waive them, as was clearly done in this case. State v. Waters, supra; State v. Klinger, supra. As defendant consented to this at the time, he can not now be heard to complain. State v. Baber, 74 Mo. 297. His failing to make objections and save his exceptions at the time constituted a waiver. State v. Smith, 114 Mo. 423; State v. Sansone, 116 Mo. 11; State v.

Howard, 118 Mo. 133. But aside from the question of waiver, the trial court had a perfect right to excuse one of the jurors, on account of sickness or death in his family, and to select another juror, and to begin the trial again. Thompson-Merriam on Juries, sec. 273; 1 Bishop's New Crim. Proc., sec. 948; Proffatt on Jury Trials, sec. 139; State v. Moncla, 39 La. Ann. 868; People v. Stewart, 64 Cal. 60; Parsons v. State, 22 Ala. 50; Pannell v. State, 29 Ga. 681; Nolen v. State, 2 Head (Tenn.) 520; 12 Encyc. of Plead. & Prac., 657. (5) Defendant, in his motion for a new trial, does not allege that the verdict was against the weight of evidence, nor that there was not sufficient evidence to justify the verdict. The simple statement of this case shows that the evidence was sufficient, and amply sufficient, to sustain the verdict. The possession of stolen goods, recently after they are stolen, raises a presumption that the party in possession is guilty of both larceny and burglary. State v. Warford, 106 Mo. 62; State v. Babb, 76 Mo. 503. It is true that all of the stolen property was not found; but proof that a part of same was in the possession of the defendant recently after the larceny, was sufficient, in connection with other circumstances, to fix the guilt on defendant of stealing all of said property. State v. James, 194 Mo. 269; State v. Owens, 79 Mo. 625. The letter written by defendant to the Caudle woman was not only admissible, but it tended to show that the defendant was guilty of attempted subornation of perjury, and that, too, in connection with this case. State v. Alexander, 119 Mo. 461; Fulkerson v. Murdock, 53 Mo. App. 154. "Evidence to show that the accused has attempted to fabricate or procure false evidence, or destroy evidence against himself, . . . . is always admissible as showing a consciousness of guilt, and is of particular value where the incriminating evidence is mainly circumstantial." Underhill on Crim. Evid., sec. 121; 1 Wigmore on Evidence, secs. 277-8; 4 Elliott

on Evidence, sec. 2712; 1 Greenl. on Evidence, secs. 37 and 195a; State v. Ward, 61 Vt. 194; Allen v. United States, 164 U. S. 499. There being substantial evidence of the guilt of the defendant, this court will not undertake to weigh the same; but will leave that duty to the jury. State v. Smith, 190 Mo. 706; State v. Payne, 194 Mo. 442; State v. Groves, 194 Mo. 452; State v. Williams, 186 Mo. 128; State v. Williams, 149 Mo. 496; State v. Swisher, 186 Mo. 8.

BURGESS, J.—Under an information duly verified and filed by the prosecuting attorney of Douglas county, charging the defendant with burglary and larceny and with being an habitual criminal, defendant was convicted in the circuit court of said county on the 23rd day of June, 1906, and his punishment fixed at imprisonment in the penitentiary for the term of his natural life.

The offense was alleged to have been committed January 3, 1906; the building alleged to have been burglarized was a storehouse belonging to T. N. and F. M. Smallwood, from which various articles of dry goods, shoes and jewelry, of the value of $94.45, were alleged to have been stolen by defendant.

In due time after verdict the defendant filed motions for a new trial and in arrest, which were overruled, and he appeals.

The State's evidence tended to prove that T. N. and F. M. Smallwood were the owners of a store building situated in the town of Denlow in Douglas county, Missouri, and that on the night of the 3rd of January, 1906, the doors and windows of said building were securely fastened. The next morning they discovered that one of the windows, which had been fastened at the top with a nail, had been prized open and the window sash taken out and set on the ground against the side of the wall. Some shoes, some men's overshoes, two bolts of red flannel, one bolt of eider down, a hat,

fifty-five finger rings, four watches and some bracelets were missing; also fifty pennies and some blue pocket handkerchiefs, all of the value of $94. The evidence further showed that early on the evening of the burglary there had been a slight rain, and immediately afterwards there was a fall in the temperature, and the ground was frozen. Close to the window that was broken open there were found the tracks of a man going up to the window from the west; these tracks were made by a number 8 shoe; going away from the window there were tracks made by a number 11 overshoe; the tracks going to the window showed that the party making them did not wear overshoes. Two or three persons followed these tracks down the road for the distance of a quarter of a mile, where a small plank was found on the ground. This was the kind of a plank that was used by merchants to wrap cloth around. At that point the tracks of an unshod horse were seen on the ground, which indicated that the horse had been standing there for some time; the horse's tracks then extended on down the road toward the town of Norwood, and to within three miles of said town. The searching parties, in company with Constable Thompson, went on to the house of the father of the defendant. This house was searched, but none of the stolen property was found, and the defendant was not there; so the constable and his posse went to the residence of one Mattie Caudle, who lived about 250 or 300 yards from the Yandell home, and searched her house. On going in, these parties heard a man and woman talking in an upstairs room; the stairway runs up on the inside of the house, but the stairway door was locked. The officer demanded of the Caudle woman that she open the stair door, but she said it was nailed up; just as the officer was about to break the door open, one of the parties saw the defendant running from the direction of said house. Constable Thompson and Mr. Martin took after him,

called to him to stop three times and fired a pistol once. The defendant continued to run, and the constable procured a horse and finally overtook him, when the defendant tried to get a rock and assault the officer. The defendant was brought back to the Caudle house, and when he saw some of the stolen property found in said house he said: "What in the hell are you going to do with my overshoes; they are mine." Mr. Smallwood spoke up and said, "This lady says that they are her brother's," and the defendant again insisted that they were his. On being asked where he got them, defendant said, "Find out; you have got me, now find out." The defendant stated to the officers that he was upstairs when he saw them coming, and jumped through a hole in the wall. In said house were found the two bolts of red flannel; one bolt was at the head of the bed, between the bed and the wall, and the other piece was at the foot of the bed, under the tick; there were also found two new pairs of shoes and one pair of stolen overshoes; the overshoes were number 11, and were found in a closet. On the way to Norwood, the defendant said that the overshoes were not his. A short time before the burglary the defendant was at the town of Denlow, claiming that he wanted to rent a house for his sister to live in, and send her children to school. After being arrested, the defendant said that he had never been to Denlow, and knew nothing about his sister wanting to send her children to school. In taking the defendant from the town of Norwood to the county jail the constable rode with him in a hack, in company with Mr. Martin. On the way, about two miles before they reached the jail, the defendant made some peculiar motions with his hands under the lap robe; these motions attracted the attention of the officer, for he thought the defendant was trying to slip his handcuffs. The next morning a penny was found in said hack on the side the defendant rode on; the next day the defendant was

searched in jail and twenty or twenty-five keys were found in his pockets; also some pennies and three blue handkerchiefs. At the point on the road where the defendant made the motion with his hands, the officer found a handkerchief of the same color, and also eleven pennies. About a quarter of a mile from the Yandell house, a man named Wes Jones was living, and Jones' wife is a cousin of the defendant. For some two weeks prior to the burglary the defendant had a trunk, which he kept upstairs at the home of Mr. Jones, he having formerly worked for Mr. Jones. On the night after the burglary, the defendant came to the Jones place, while Mr. and Mrs. Jones were away from the house, stayed a while, went up stairs and left before bedtime. He took a grip away with him, saying he was going to see his brother. A few days afterwards the officers came to the Jones house and tried to open this trunk, but it was locked; as Mr. and Mrs. Jones did not have the key to it, the officers took an axe and broke it open. In the trunk were found some of the stolen rings, some knives, some razors, some bracelets, scarf pins and watch-chains wrapped up in a blue handkerchief, like the ones that were stolen; they also found a black hat in said trunk, which was identified as the stolen hat. The officers testified that this jewelry had tags on the same, and the tags were identified by the Messrs. Smallwood as showing their price mark.

While in jail, the defendant wrote the following letter:

Ava, Mo., Jan. 10, 1906.

Mrs. Mattie Caudle:

Kind Friend.—I thought I would write you a few lines to let you know that I am well, truly hoping these few lines will reach their destination and find you well. Well, Mattie, you know what you said; you ought to stick to what you said; there is no chance for me; be of good cheer. Write and tell me if you are coming down

when I have my trial. Now, Mat., I will live and die for your sake; you ought to have stuck to what you first said, now, honey, you always told me if I got into trouble that you would spend everything you had for me. Honey, you know that my life never, never will be any pleasure if I cannot be with the one that I love. Honey, you must not write in any way about what has happened when you write, just write and tell me if you are well. Mat., they cannot hurt you in any way; I will see that they don't hurt you in any way with the law. Now May keep says: "Yea and Nay." If you will you can sell your land and help me out of trouble. When you answer, if you aim to do what I asked you to do, just put O. K. at the bottom of your letter, then I will know what you aim to do. Now, Mat., this letter will be registered to you without anyone knowing anything about it. Be sure to write like that you ever got a letter from me first. I don't want them to find out that I ever slipped a letter to you. Now, Mat., if you find out anything about my case that you think would do me any good, you can write and tell me; but be sure and be careful what you write. I will not sign my name to this letter, for you will know my hand write. Now, Mat., don't sign your name to your letter when you write, sign some other name, some young girl's name; then we can write like we was sparking. Now, Mat., when you get this read it carefully, and if the postmaster asks you who it is from don't tell anything about it.

Yours truly,

— — — — — — —.

The State also introduced in evidence a certified copy of the record of the circuit court of Webster county, Missouri, showing that the defendant was convicted in that court of burglary and larceny on September 20, 1900, and was sentenced to the penitentiary for three years for the burglary and two years for the larceny. The State also introduced in evidence a certifi-

cate from the warden of the penitentiary, showing that the defendant was received into the penitentiary May 23, 1901, for the term of five years for burglary and larceny, having been sentenced by the circuit court of Webster county, and that he was discharged June 18, 1904.

The defense was an alibi, and the defendant testified that he was in the town of Norwood on the afternoon and evening of the burglary and went home between nine and ten o'clock; that his father and two sisters and himself occupied the same room that night; that he was not at Denlow, and knew nothing of the burglary. He admitted having possession of the stolen jewelry, but claimed that this jewelry and some razors were turned over to him by a man named Arthur Peacock, who had since died; that Mr. Peacock employed him to peddle this jewelry around the country, and had given it to him tied up in a handkerchief, in November prior to the burglary. The defendant, however, could not remember whether he had peddled any of it or not, but claimed that he had told his sisters and father of his arrangement with Mr. Peacock. The defendant further stated that he was at the Caudle woman's house the morning he was arrested, and saw the constable and his posse coming, and concluded that he had better run away. He did this, because of certain scandalous reports that had been circulated in that neighborhood regarding him and this lady. He further said he went there for the purpose of talking to her about leasing some land, and was talking to her on that subject, and also about the rumors regarding them that were afloat in the neighborhood. He said that he jumped out of a window when he saw the officers coming, and ran off, leaving his hat in the house. The defendant further admitted that he had been convicted of burglary and larceny in Webster county; that he afterwards pleaded guilty to the crime of burglary and larceny, and that he afterwards pleaded guilty to the charge of felonious as-

sault, receiving penitentiary sentences therefor, some of which sentences were afterwards reduced.

The defendant's sister and father testified that they were at home and occupied the same room with the defendant the night of the burglary, their mother being away, and that defendant came home between 9 and 10 o'clock, and remained home the rest of the night. His sister, Minnie, denied stating to the officers that the defendant had not been at home for two weeks.

Frank Jones and Joe Credon testified to the fact that the defendant had a trunk at the Jones house; that he kept some jewelry and a black hat there.

Mattie Caudle testified that an effort had been made to bribe her by the sheriff, he having offered her $15 to testify against the defendant, Charles Moshier and Bonnie Wyatt. She admitted that the constable took some red flannel from off the foot of her bed and from behind her bed, but claimed that her husband gave it to her, and that he brought it there Wednesday or Thursday before. She admitted, however, that she and her husband had been separated for two years. She said that those shoes were for ladies, and belonged to her, and that she got them from some man who traveled around and bought up iron and rubber; that they asked her if they could leave the shoes there, and she consented; this was along in the fall, and the shoes had been in her closet ever since. She admitted that the defendant had been to her house very frequently to see her but always in reference to leasing this land, and that he was there that day exclusively for that purpose. She said that they had been talking that morning for three-quarters of an hour before the officers came, but they did not talk on any other subject except the subject of leasing this ground. She further testified that when they saw the officers coming, the defendant walked out the door and did not jump out of the window nor go upstairs. The overshoes, she said, she bought at Peyton's

store early in the spring, and had had them a good while; that she bought two pairs, intending to give her mother one pair. She denied stating to Charles Sanders and Frank Ball that the defendant brought said goods there. She further admitted that she had in the house a pistol belonging to the defendant, but said that she kept it there for the purpose of shooting a chicken hawk.

In rebuttal, the State proved by Jailor Eslick and Joe Spurlock that the defendant, after he was placed in jail and told of the finding of the jewelry in his trunk, said that if there was any jewelry in his trunk somebody else put it in there. The State also proved by Sheriff Sanders and Deputy Sheriff Ball that the Caudle woman first stated to them that she got that flannel from Uncle Bill Peyton, and afterwards said that defendant brought it there. The State also proved by Constable Thompson that the defendant's sister, Minnie, stated, when the constable searched her house two days after the burglary, that she had not seen the defendant for two weeks.

The record discloses that on the 20th day of June, 1906, the defendant was brought into court, and that the sheriff returned into court a special venire of forty, from which a panel of thirty men qualified as jurors, were selected; that the respective parties made their challenges, and from this panel of thirty there were twelve jurors selected by the parties to sit upon the trial of the cause; that said jurors were duly sworn as the law directs, and the trial proceeded with. That, thereafter, one of said jurors, W. C. Hale, was excused by the court from further service on said jury because of the sudden illness of his wife; that thereupon the court adjourned until the next morning, when it again convened, and one Harry Martin was submitted as a juror in the place of said Hale; that said Martin was duly qualified and the jury sworn as the law directs to try

the cause. That before the trial of the cause was again proceeded with the defendant filed a motion to discharge the jury upon the ground that he was entitled to twenty peremptory challenges, whereas he was allowed but twelve. The motion was overruled. He assigns error.

As the defendant was informed against for the second offense of burglary and larceny, it is contended that, upon conviction, the punishment must be imprisonment for life, and that, hence, he was entitled to challenge twenty instead of twelve of the panel of thirty.

By section 1890, Revised Statutes 1899, it is provided that every person who shall be convicted of burglary in the second degree shall be imprisoned in the penitentiary for not less than three years, but no limit of imprisonment is declared. Section 2619, Revised Statutes 1899, provides that "the defendant in every indictment for a criminal offense shall be entitled to a peremptory challenge of jurors in the following cases, as follows: First, if the offense charged is punishable with death, or by imprisonment in the penitentiary not less than for life, to the number of twenty, and no more; second, if the offense be punishable by like imprisonment, not less than a specified number of years, and no limit to the duration of such imprisonment is declared, to the number of twelve, and no more."

If the second clause of this section of the statute is to govern, it is clear that the defendant would only have been entitled to twelve challenges, because the punishment prescribed by section 1890, supra, for burglary in the second degree is not less than three years in the penitentiary, with no limit to the duration of such imprisonment, which may be for life. But this statute is applicable only to first offenses of that character, and not to a case where the conviction is sought, as in this case, under section 2379, Revised Statutes 1899, which, because of the increase in and severity of the punishment

of the person convicted of the second offense, confers upon him the right to twenty challenges. Said section provides:

"If any person convicted of any offense punishable by imprisonment in the penitentiary, or of any attempt to commit an offense which, if perpetrated, would be punishable by imprisonment in the penitentiary, shall be discharged, either upon pardon or upon compliance with the sentence, and shall subsequently be convicted of any offense committed after such pardon or discharge he shall be punished as follows: First, if such subsequent offense be such that, upon a first conviction, the offender would be punishable by imprisonment in the penitentiary for life, or for a term which under the provisions of this law might extend to imprisonment for life, then such person shall be punished by imprisonment in the penitentiary for life; second, if such subsequent offense be such that, upon a first conviction, the offender would be punished by imprisonment for a limited term of years, then such person shall be punished by imprisonment in the penitentiary for the longest term prescribed upon a conviction for such first offense; third, if such subsequent conviction be for an attempt to commit an offense which, if perpetrated, would be punishable by imprisonment in the penitentiary, the person convicted of such subsequent offense shall be punished by imprisonment in the penitentiary for a term not exceeding five years."

It is clear that if the offense of which the defendant stands convicted in this case had been his first offense, it would, under the provisions of the law, be punishable by imprisonment in the penitentiary for a term of not less than three years, and the punishment might extend to imprisonment for life. Therefore, under the express provisions of the section last cited, the punishment imposed for such second offense is imprisonment in the penitentiary for life, and, consequently, the defendant

was entitled to twenty challenges. But this was a right which defendant could waive. [State v. Bell, 166 Mo. 106, and authorities cited.] Defendant made no objection whatever to the panel of thirty qualified jurors. As before stated, the record discloses that it was only after the jury had been sworn the second time to try the cause that the defendant presented his motion to discharge the jury for the reason that he was entitled to twenty challenges, when he was allowed but twelve. Nor was there any objection to the twelve jurors selected and sworn to try the cause, and it must be presumed that they were satisfactory to both parties.

Section 2622, Revised Statutes 1899, provides: "There shall be summoned and returned in every criminal cause a number of qualified jurors equal to the number of peremptory challenges, and twelve in addition; and no party shall be required to make peremptory challenges before a panel of such number of competent jurors shall be obtained."

As we have said, the defendant had a right to twenty challenges, but this important privilege could be waived by him if he felt so disposed. [State v. Klinger, 46 Mo. 224.] Had he insisted upon this right in time, and it had been denied him by the court, such refusal would have been error; but as defendant made no objection before the jury was sworn, he will be regarded as having acquiesced, and as having waived his said right. [State v. Waters, 62 Mo. 196.]

Instructions numbered two and three, claimed to have been given by the court, are criticised by defendant upon various grounds; but no instructions whatever are embraced in the bill of exceptions. There are what purport to be instructions given by the court copied into what seems to be the record proper, but it nowhere appears in the bill of exceptions that said instructions were excepted to at the time they were given. They cannot, therefore, be considered upon this appeal.

No point is made by defendant in his motion for a new trial in regard to the admission of improper evidence on the part of the State; nor is any complaint made in said motion of the refusal of the court to admit proper evidence offered by the defendant. Therefore, the admission or exclusion of evidence cannot be considered by this court. [State v. Laycock, 141 Mo. 274.]

Defendant does not allege in his motion for a new trial that there was no substantial evidence to sustain the verdict; but only says that the verdict is against the evidence in the case. The evidence as shown by the record very conclusively proved defendant guilty. Besides, its weight was for the consideration of the jury, and they having found the defendant guilty as charged, and their verdict having been approved by the trial court, said verdict will not be interfered with. [State v. Smith, 190 Mo. 706; State v. Swisher, 186 Mo. 1; State v. Williams, 149 Mo. 496.]

Finding no reversible error in the record, we affirm the judgment.

All concur.