THE STATE v. CLINTON IRVIN, W. D. IRVIN, BERLIE IRVIN, GILA IRVIN and JOE IRVIN, Appellants.—22 S. W. (2d) 772.

Division Two, December 11, 1929.

*Gertrude M. Williams*, for appellants.

*Stratton Shartel*, Attorney-General, and *Ray Weightman*, Assistant Attorney-General, for respondent.

HENWOOD, C.—This case comes to the writer of this opinion on reassignment.

By an information filed in the Circuit Court of Barton County, the defendants were jointly charged with stealing chickens in the nighttime from the premises of C. W. Redd, upon which his dwelling house was situated. They were tried together, found guilty, and the punishment of each assessed at imprisonment in the penitentiary for five years. From the judgment and sentence entered on the verdict, they have perfected an appeal to this court.

The prosecuting witness, C. W. Redd, lived on his own farm, containing 160 acres of land, in Barton County, Missouri, near the Kansas line, and five miles east of Pittsburg, Kansas. The defendants Clinton Irvin, Gilva Irvin and Joe Irvin are sons of the defendants W. O. Irvin and Berlie Irvin. The Irvins lived on premises, containing about five acres of land, in Kansas, near the Missouri line, and about seven and one-half miles northwest of the Redd farm. In substance, the evidence offered by the State is as follows:

On the night of November 19, 1928, 119 chickens were taken from Redd's chicken house, including 101 white leghorn hens, 14 plymouth rock hens, 1 barred rock hen, 2 white leghorn roosters, and 1 black Minorca rooster. "The leghorns were worth about seventy-five cents a piece and the others about a dollar a piece." These chickens were missed the following morning, when it was discovered that two boards had been torn off of the west end of the chicken house. The Yale lock on the door of the chicken house had not been disturbed. The chicken house was "about 27 steps" west of Redd's dwelling house and on the same premises. Three "tracks through the wheat field about sixty steps, straight out to the road," where a "car" had been turned around, were found on

the day following the theft. Two strings and the head of a chicken were found at the point where the chickens were thrown over Redd's fence. One of these strings "corresponded" with a string which was seen in the Irvin chicken house a few days later. Two days after the theft, Redd and his wife visited the stores or business houses of two poultry dealers in Pittsburg, Kansas, during the course of their search for the stolen chickens. They found a barred rock hen at one of these poultry houses, and a Minorca rooster at the other, which they identified as the barred rock hen and the Minorca rooster taken from their chicken house. These two chickens were taken to Redd's premises, and, upon being turned loose there, "the black rooster jumped up on a load of corn and started to eating and the hen went to the hen house and went to roost. Later he [the rooster] went back to the hen house and went to roost." On November 20, 1928, one of the poultry dealers mentioned bought a mixed lot of chickens from the "Irvin family—Mr. Irvin, Mrs. Irvin and two of the boys. It might have been Mrs. Irvin and the two boys only." A check for $15.20, payable to W. O. Irvin, was given in payment for these chickens. The barred rock hen in question was among these chickens. On November 21, 1928, the other poultry dealer mentioned bought six hens, two leghorn pullets and a black Minorca rooster from "Mrs. W. O. Irvin" and gave her a check for $5, payable to W. O. Irvin, in payment therefor. "One of the boys and her daughter-in-law" were with Mrs. Irvin when she brought these chickens to the poultry house. The black Minorca rooster in question was among these chickens. Both of these poultry dealers had bought chickens from the Irvin family previously, on various occasions.

The State was permitted, over the objection of the defendants, to introduce evidence tending to show them guilty of stealing other chickens on the same night Redd's chickens were stolen.

The State also offered evidence tending to show admissions of guilt by the defendants Clinton Irvin and W. O. Irvin. Some of these alleged admissions of these defendants tend to incriminate their codefendants and some do not. And some of the evidence as to these admissions was objected to and some was not.

Each of the defendants denied any connection with the offense charged and disclaimed any knowledge thereof. Their testimony and the testimony of their supporting witnesses tends to prove their defense of alibi. Evidence offered by the defendants further tended to show that all of the defendants except Gilva Irvin were interested in raising and marketing chickens during the year of 1928, and that, during that year, they raised a mixed flock of 600 or 700 chickens, including plymouth rock chickens and white and black chickens. The defendants Clinton Irvin and W. O. Irvin al-

so denied that they made any of the admissions testified to by witnesses for the State.

In rebuttal for the State, one witness testified that the general reputation of the "Irvin family, for honesty and fair dealing or as a law-abiding people," was bad. Another witness testified that the general reputation of the "Irvins, for honesty and fair dealing, what people usually say about them," was bad.

I. The defendants complained in their motion for a new trial, and now complain, of the action of the trial court in admitting evidence tending to show them guilty of stealing other chickens on the same night Redd's chickens were stolen.

In this connection, the record shows that O. A. Richwine was permitted to testify, over the objection of the defendants, that he lived two and one-half miles east of Redd's farm, and on the same road that extends west along Redd's farm and into Pittsburg, Kansas; that twelve Rhode Island red hens were stolen from his hen house on the same night Redd's chickens were stolen; that, while he and Redd were at the "Irvin place" and in the Irvin chicken house a few days later, he picked up "the mate" to the string he found in his hen house after his chickens were stolen; that "a fellow could have picked up a half of a barrel of strings" in the Irvin chicken house; and that, two days after his chickens were stolen, he went to one of the poultry houses in Pittsburg, Kansas, and found there two chickens which he thought were among the chickens stolen from his chicken house, but he did not take these two chickens away from the poultry house. In the same connection, E. H. Rabbitt, manager of the poultry house, was permitted to testify, over the objection of the defendants, that the two chickens identified by Mr. Richwine as his (Richwine's) chickens were among a mixed lot of chickens which he (Rabbitt) bought from the "Irvins."

The stealing of Richwine's chickens and the stealing of Redd's chickens, the offense charged, were independent transactions. It is not even claimed that these two larcenies were parts of the same transaction, nor that they were parts of a common scheme or plan of the defendants to steal chickens. Nor was evidence of another larceny admissible to show intent, as the commission of the larceny charged is undisputed and from that act intent is presumed. It follows that the evidence relating to the stealing of Richwine's chickens was inadmissible for any purpose. This evidence was highly prejudicial, and, in admitting it over the timely objection of the defendants, the trial court committed reversible error. [16 C. J. 603; State v. Spray, 174 Mo. 569, 74 S. W. 846; State v.

Saunders, 288 Mo. 640, 232 S. W. 973; State v. Barker (Mo. Sup.), 249 S. W. 75; State v. Dixon (Mo. Sup.), 253 S. W. 746.]

II. The complaint, in the motion for a new trial, as to "testimony of a purported admission of guilt on the part of one defendant on trial as against his codefendants," is too vague, indefinite and uncertain to meet the requirements of the statute, where, as here, there is evidence tending to show various admissions of two defendants, and some of the alleged admissions tend to incriminate the other defendants and some do not, and some of the evidence relating to the admissions was objected to and some was not. The complaints as to given and refused instructions are in the same situation, being general in character and without any specification as to the matters complained of. [Sec. 4079, Laws 1925, p. 198; State v. Standifer, 316 Mo. 49; 289 S. W. 856.] However, we feel impelled to say that the evidence relating to the admissions of Clinton Irvin and W. O. Irvin should not have been considered as evidence against their codefendants and the trial court should have so instructed the jury; and that the State's witnesses should not have been permitted to offer their conclusions as to what these defendants meant by the statements or admissions said to have been made by them. It should also be noted that the evidence of the bad reputation of the "Irvin family, for honesty and fair dealing," though not objected to, was wholly improper and highly prejudicial. True, a defendant may be impeached in the same way as any other witness. [Sec. 4036, R. S. 1919.] And, all of the defendants having testified, the State had the right to prove that the reputation of each of them, for truth and veracity, was bad, and also that the general reputation of each of them, for morality, was bad, as affecting their credibility. But, the State had no right to attack the character of any of them as a defendant; in other words, the State had no right to show that the reputation of any of them was bad as to the particular trait of character involved in the offense charged. [State v. Ross, 306 Mo. 499, 267 S. W. 853; State v. Bugg (Mo. Sup.), 292 S. W. 49.] Furthermore, the State should not have been permitted to prove that the reputation of the defendants was bad, in any particular, by proving that the reputation of the "Irvin family" was bad, whether such proof was objected to or not. Such procedure is entirely without support in reason or precedent.

III. Because of the condition of the record, as above indicated, we refrain from expressing an opinion as to the sufficiency of the evidence. In the event of another trial of this case, the defendants should be tried as individuals with individual rights and not as the "Irvin family" nor as the "Irvins," and the other errors mentioned should be avoided, in order that each of the defendants may be accorded a fair and impartial trial. "Surely it is better that justice travel with leaden foot, rather than that she should walk rough-shod over the constitutional rights of citizens to be equal one with another before the law," State v. Guerringer, 265 Mo. l. c. 418, 178 S. W. l. c. 67. See also State v. Taylor (Mo. Sup.), 8 S. W. (2d) l. c. 37.

The judgment is reversed as to each of the defendants and the cause remanded. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion of HENWOOD, C., is adopted as the opinion of the court. *Blair, P. J.,* and *White, J.,* concur; *Walker, J.,* absent.