**STATE of Missouri, Respondent,**

v.

**Sharon KINNE, Appellant.**

**No. 49480.**

Supreme Court of Missouri,

Division No. 2.

Oct. 21, 1963.

Motion to Transfer to Court En Banc
Denied Nov. 11, 1963.

James Patrick Quinn, Martha Sperry Hickman, Quinn, Peebles & Hickman, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., Theodore C. Beckett, Special Asst. Atty. Gen., Jefferson City, for respondent.

BARRETT, Commissioner.

A jury has found that Sharon Kinne shot and killed her husband, James Kinne, that she was guilty of murder in the first degree and of necessity therefore fixed her punishment at life imprisonment. RSMo 1959, Secs. 559.010, 559.030, V.A.M.S. Upon the trial of her case the state waived the death penalty and for that reason over the appellant's objection, the court called a panel of thirty-four jurors rather

than a panel of forty-seven, thus of course reducing the number of challenges by the defendant. The statute applicable to Jackson County and a defendant's peremptory challenges provides that "If the offense charged is punishable with death, *or by imprisonment in the penitentiary not less than for life,* to the number of twenty, and no more." RSMo 1959, Sec. 546.180, subd. 2(1) (a), V.A.M.S. At the January 1963 Session of this court it was decided, the punishment for first degree murder being "not less than life," that because of the refusal to call a panel of forty-seven jurors her conviction would necessarily have to be reversed. State v. May, 168 Mo. 122, 67 S.W. 566; State v. Yandell, 201 Mo. 646, 100 S.W. 466; State v. Naylor, 328 Mo. 335, 40 S.W.2d 1079. The court was satisfied with that part of the opinion and it is not necessary to elaborate upon that phase of the appeal, it is sufficient to summarily say that for failure to follow the plain mandate of the statute and call a panel of forty-seven jurors the judgment must be reversed and the cause remanded for a new trial. After adoption of the opinion, however, a rehearing was granted as to a single specific matter, state's witness John Boldizs and whether the state prejudicially erred in its examination of him,—hence this opinion upon reassignment of the cause.

Boldizs was called as a state's witness and after cursory questions establishing that he too lived in Independence, was a service station attendant, married, and had known Sharon Kinne since high school days in 1956, he was asked whether he had had sexual relations with Sharon before and after her marriage—and his answer to both questions was "Yes." Then there were these questions and answers on direct examination:

"Q. Has she ever discussed her husband with you? That is, James Kinne?

"A. Yes. sir.

"Q. Was there anything ever said about your killing James Kinne for her?

"A. *Yes, sir, in a joking way.* (Emphasis supplied.)

"Q. What do you mean by that?

"A. Well, we was parked one night, and, I made a comment to her that I'd like to carry her off, and she said, 'Well, if'—you know, I'd like to carry her off if it wasn't for her husband, and she said, 'Well, I'll just give you a grand and we'll just get rid of him.'"

Then the prosecuting attorney, without stating his purpose or reasons, and without attempting to refresh Boldizs' memory or avowedly to lay a foundation for impeachment asked this question:

"Q. Mr. Boldizs, you gave the Sheriff's office a statement in connection with the thousand dollar offer, did you not?

"A. (Nodding head)."

There were, of course, timely and specific objections throughout by defense counsel, objections to cross-examination and impeachment "of their own witness," objections of "no surprise," "that his evidence is not unfavorable to the State," that there was "no entrapment" and "no positive evidence given against them," that Boldizs was not a "hostile witness" and there was "no entrapment." And the prosecuting attorney continued:

"Q. And you also testified before the grand jury on June 27, 1960.

"A. Yes, sir.

"Q. And in your statement to the Sheriff's office, and in your statement before the—testimony before the grand jury, did you tell either of those that this was in a joking manner?

* * * * * *

"A. I believe I did. * * *"

It was then developed that in a deposition taken by the appellant "last Friday" he had said "the conversation (with Sharon) was in a joking manner." At that point state's counsel handed the court a copy of Boldizs' testimony before the grand jury on June 27, 1960 and the court said "in view of that" it was proper for the state to cross-examine the witness. Defense counsel said, "Do I understand that you are ruling, Your Honor, is to cross-examination, and not to impeachment?" The court replied, "Why certainly." But the state proceeded and established what Boldizs had said in his deposition:

> "Well, we was parked out here at this particular spot off Phelps Road, and we was out there jacking around, and we was making out a little bit, and as near as I can recall, it come up—we was like making out, and I said, 'Man, like I'd like to carry you off if you wasn't married' and she said, 'Well, I'll just give you a grand, you can bump off my old man,' and I said, 'No, man, like we won't do that' and we laughed about it, and I said, 'Well, I'll find somebody for you' and this jazz, and then we proceeded to make out."

And then the state read to Boldizs from his grand jury testimony concerning a conversation a week before Sharon's husband was killed:

> "Q. Was there anything unusual?
>
> "A. Yes, sir. It was approximately two weeks to four weeks before his death, we was talking, parked, we were talking about her husband I think, and she told me they had problems. She said, 'Would you kill my husband for $1,000?' And I said, 'No, hell no.' She said, 'Do you know somebody that would?' And I said, 'Yes, I know somebody.' She said, 'If you find somebody, let me know.' I said, 'Yes,' but I never did.
>
> &ast; &ast; &ast; &ast; &ast; &ast;

"Q. Do you have a feeling she was serious in her request?

"A. I believe so now."

Then as to these questions and answers before the grand jury state's counsel asked Boldizs whether the questions were asked and these answers given. He answered "Yes" but asked state's counsel if he could "interrupt" and he said, "As you probably know, they pressured me quite severely through this thing." He explained that at the time "the Jones case was going strong," police officers were threatening to charge him with the Jones murder, and he said "at that time I would have signed anything they put up there as long as it said I didn't kill Patricia Jones." And then the state's attorney asked Boldizs about "picking Sharon up" once (probably in connection with the Jones case) and "questioning her for the benefit of the Sheriff's office" and there were these questions and answers:

> "Q. And during that conversation didn't she tell you not to tell the sheriff's office about this thousand dollar, this previous—
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> "Q. Did she ask you not to tell the sheriff's office anything?
>
> "A. She said I didn't have to say anything.
>
> "Q. And she told you not to let them bully you?
>
> "A. That is right."

The state then established that Boldizs had been "a witness in the other trial" (probably referring to the Jones murder trial) and that prior to that trial "opposing counsel" had taken a question and answer statement from him "And I wasn't present." Then the state established that "30 or 40 days" ago Sharon's counsel had taken another statement from him "And again you did not advise the prosecutor's office?" And then the prosecutor examined Boldizs as to whether in the statements procured by de-

fense counsel he had said anything about "wanting to carry her off," and there was this question and answer:

"Q. And so you gave him a statement and simply volunteered the information that this was said in a joking manner?

"A. Yes."

And then there were these questions and answers:

"Q. Do you recall telling Donald Boone (a truck driver and another state's witness) that Sharon had offered you a thousand dollars to kill her husband?

\* \* \* \* \* \*

"A. Yes, sir.

"Q. You did tell him?

"A. Yes.

"Q. Did you tell Donald Boone that it was a joking manner?

"A. I don't remember, it has been too long ago."

On redirect examination by the state another subject was introduced and there were these questions and answers:

"Q. When you testified here last summer, you testified that you had given them (defense counsel) a statement, they had a court reporter take it down, that you did not tell them the truth because you didn't consider it any of their business—

"A. Yes, sir—

\* \* \* \* \* \*

"Q. So the transcript that Mr. Quinn has cross-examined you on, that is a copy of the statement that you gave that you said was a bunch of lies because you didn't consider it any of their business?

"A. The thing that you are referring to is they asked me about a tape recording and I told them 'no.'

\* \* \* \* \* \*

"Q. But you did lie to them at that time?

"A. Yes, sir."

State's counsel then returned to Boldizs' sex relations with Sharon, before and after her marriage, and whether "Sheriff's deputies had accused you of murder" and there were these additional questions and answers as to whether Sharon had offered him money to kill her husband.

"Q. The statement that you made that she had offered you a thousand dollars to kill her husband, or if you wouldn't do that would you find somebody to kill him, that was a voluntary statement on your part, wasn't it?

"A. Yes, sir.

"Q. No one else knew about that until you told them?

"A. Don Boone knew about it.

\* \* \* \* \* \*

"Q. So you voluntarily told them?

"A. Why sure.

"Q. And is it your testimony that you told them that she made that statement in a joking manner?

"A. Pardon?

"Q. Did you tell the Sheriffs that she made that statement in a joking manner?

"A. I think so. \* \* \* I am almost certain I did.

\* \* \* \* \* \*

"Q. Did you tell the grand jury that this was made in a joking manner?

"A. I am almost certain it was brought up."

There was further cross-examination and impeachment by the state of its witness Boldizs, but the quoted excerpts are sufficient for the purposes of illustration and to place in context the questions briefed and argued by the parties. The appellant

contends that Boldizs was not an adverse or hostile witness, that there was no surprise or entrapment in his testimony and that therefore the court in permitting the state to thus cross-examine and impeach him prejudiced her right to a fair trial. In this connection it is said that in permitting this cross-examination and impeachment there was an "unfair and double advantage. It permits the inference that, not only was the witness telling the truth in the first place and is now lying, but, that the change in his testimony was caused by the opposing party and consequently, the opposing party is guilty of suborning perjury on top of whatever else (she) may be charged with." The appellant advances as a reason against the adoption of the rule contended for by the state that "Counsel for the defense were put in the position of defending the State's own witness as well as themselves. No more prejudicial situation could have been created against this defendant." In addition to her argument against the indicated examination of the witness, the appellant also urges that the court prejudicially erred in refusing to give her proffered instruction which told the jury that "you are not to consider the statements and testimony of the witness Boldizs given before this trial as evidence of the facts stated in them but only in reference to the truth or falsity of this witness in this trial." In contrast to these arguments the state makes the contention that the court "properly allowed the prosecution to cross-examine its witness John Boldizs and all of his testimony was admissible in the trial as substantive evidence." And, of course, if Boldizs' various statements were admissible as substantive evidence, the court was not bound to give an instruction limiting either their purpose, force or effect.

■ In view of these contentions, particularly in view of the state's argument, it is necessary to note in passing certain fundamental matters relating to witnesses and evidence that are not involved upon this record and this appeal. If a witness in either a civil or a criminal case becomes obviously antagonistic or unwilling, the party calling the witness, may in the court's discretion, ask the witness leading questions. State v. Shelton, 351 Mo. 799, 174 S.W.2d 202; State v. Palmer, (Mo.), 306 S.W.2d 441. If the witness becomes "hostile" and contradicts "previous statements and testimony," the court may permit the party calling him to cross-examine the witness. State v. Bell, 359 Mo. 785, 223 S.W.2d 469. This latter rule was most recently considered by this division of the court in State v. Taylor, (Mo.) 324 S.W.2d 643, 647–648. It should be noted in that case, however, that when cross-examined or led the witness testified to what he had seen or knew, to wit, that on Saturday before the appellant's arrest for an assault he had seen the appellant and "at that time (he) had sticking in his belt a revolver with a brown handle similar to the assault weapon." But of greater significance here is this statement by the court: "The cases the defendant relies on relate to the impeachment by the state of its own witness and are not helpful on the facts of this case." Another facet of these general rules is that as to a reluctant or hostile witness the court may properly permit a prosecutor "to exhibit to certain witnesses for the state copies of their testimony before the grand jury for the purpose of refreshing their memories." State v. Riles, 274 Mo. 618, 623–624, 204 S.W. 1, 2.

■ But as indicated, these problems are not involved upon this record. In the quoted excerpts there was obviously no attempt to refresh Boldizs' memory, and no indication that he was reluctant or hostile. And the state does not claim that he became an "adverse" witness or that he was "hostile" as that term is defined in the cases. Nor was the state under a legal duty to call Boldizs as its witness (58 Am.Jur. Sec. 795, p. 441), in this jurisdiction the state is not compelled to call all persons who may have witnessed a homicide or who may have some knowledge of the offense. State v. Eaton, 75 Mo. 586; State v. Billings, 140 Mo. 193, 41 S.W. 778. Furthermore, in

both its briefs and oral argument, the state candidly admits that it was not "surprised" by Boldizs' testimony on direct examination and it is not claimed therefore that there was an entrapment. In fact the state's contention here is a tacit admission of the appellant's claim, at least under the state's argument the appellant's contention is beside the point because the state claims that in any event "all of his testimony was admissible in the trial as substantive evidence" even though introduced on cross-examination and in impeachment of its own witness.

■ In approaching the state's candid position it is not possible, however, to entirely ignore the appellant's contention and a thoughtfully established precedent. A leading case is State v. Bowen, 263 Mo. 279, 172 S.W. 367 (and earlier State v. Bowen, 247 Mo. 584, 153 S.W. 1033). In that case the appellant had been convicted of rape upon his stepdaughter, "under the age of 14 years." The appellant's brother-in-law was called as a state's witness and after testifying to certain facts and statements by the defendant was asked whether he remembered any other statement by the defendant in connection with the child's death. He answered, "If he said anything else, I don't remember it." Thereupon state's counsel inquired, "Did you testify before that grand jury?" He answered that he had and the prosecutor proceeded to read to the witness from his grand jury testimony in which he had said "and he made a confession to me by saying, 'I am responsible for it,' and didn't accuse any other party." It was held that the witness had not become "adverse" and that it was prejudicially erroneous to thus contradict him with his grand jury testimony. The court reviewed all the general rules but emphasized these reasons for reversing the judgment: "There are several reasons why a witness who has not become adverse should not be so contradicted. The first is this: Such contradictory statements are never used for any purpose except to im-

peach the witness. They are not to be considered by the triers of fact for any other purpose. On what theory is a witness to be impeached when he has merely failed to testify? It has been said that the contradiction of such a witness is the destruction of a straw man erected by the party himself, for its effect upon the jury. Another reason is that such a method of contradiction, if it did not open up the floodgate for the admission of hearsay evidence, would go much too far in that direction." This court, along with all others, has usually advanced as the basis for the rule against a party's calling and then impeaching his own witness the traditional reason that in calling the witness the party vouches for his credibility and should not therefore be allowed to impeach him merely because his testimony proves disappointing. But "(i)t is probable that the true rationale of the rule, as it is generally applied, is that 'the party (calling the witness) ought not to have the means to coerce his witness' into testifying as he desires because he has the power to injure him as a witness if he testifies unfavorably or to make him a good witness in the event his evidence does not prove to be disappointing. 3 Wigmore, Evidence, Sec. 899. In short, the true purpose of the rule is to protect the witness against coercion and abuse." Crabtree v. Kurn, 351 Mo. 628, 646–647, 173 S.W.2d 851, 858–859. The rule was applied in rather bizarre if not dramatic circumstances in another leading case on the subject, State v. Gregory, 339 Mo. 133, 96 S.W.2d 47. There the charge was robbery and two state's witnesses having been sentenced to be executed refused to testify at all and the prosecutor read their testimony from a former trial. The court reexamined all the cases, reaffirmed the indicated rule as "correct in principle" and held that "prejudicial error was committed against the appellant." State v. Patton, 255 Mo. 245, 164 S.W. 223, illustrates in detail exactly how the state may and may not employ grand jury testimony to refresh the memory of its faltering or vacillating witness and there was no at-

tempt here by the state to follow and employ those suggestions.

The plainest exposition and application of all the relevant rules is contained in Woelfle v. Connecticut Mutual Life Ins. Co., 234 Mo.App. 135, 112 S.W.2d 865. There the plaintiff sought to recover the accidental death benefits of a life insurance policy. To prove her husband's accidental death the plaintiff called as a witness Block (introduced his deposition), her husband's golfing partner the day he was stricken. When asked what happened, Block said "there was nothing unusual that I know except we lost our ball." On the pretext of refreshing Mr. Block's memory plaintiff's counsel inquired whether he had seen Dr. Woelfle fall that day and he answered that he had not. Plaintiff's counsel then confronted the witness with three prior contradictory statements in which he had said that he saw the doctor fall (the most crucial fact in the case), and counsel proceeded to examine him as to why he had repudiated these prior statements. Space does not admit of full quotation from this excellent opinion but it was held that Mrs. Woelfle was not obliged by law to call Block as a witness (even though he was the only possible witness to a fall), that there was no surprise or entrapment, and that he could not be impeached by his former statements. These and the following cases set forth the general rules applicable in this jurisdiction and elsewhere: State v. Randolph, (Mo.) 39 S.W.2d 769; State v. Hogan, 352 Mo. 379, 177 S.W.2d 465; Ann.Cas.1914B, p. 1120; 74 A.L.R. 1042; 117 A.L.R. 326. As to the state's claim that all of Boldizs' testimony "was admissible in the trial as substantive evidence" it may only be said that up to now "The general rule is almost universally recognized that evidence of extrajudicial statements made by a witness who is not a party and whose declarations are not binding as admissions is admissible only to impeach or discredit the witness, and is not competent as substantive evidence

of the facts to which such statements relate." Annotation 133 A.L.R. 1454, 1455.

In addition to the Woelfle case, one other civil case and two criminal cases suggest some practical if not policy considerations against the rule as contended for by the state. If such a rule justly exists and is available to the state and its faltering witnesses it should likewise be available to the defendant in a criminal case and to the plaintiff in a civil action as Mrs. Woelfle claimed. And, in Dunn v. Dunnaker, 87 Mo. 597, the plaintiff attempted to establish his malpractice action in precisely this manner. To prove his case the plaintiff called Dr. Bigger and then attempted to show out of court statements contradictory of his testimony. But the court held that after introducing the doctor as a witness the plaintiff could not impeach his testimony. In State v. Drummins, 274 Mo. 632, 204 S.W. 271, the appellant was charged with seduction and to prove the prior unchaste character of the prosecutrix called two witnesses and inquired whether on specified occasions they had had sexual intercourse with the prosecutrix. The witnesses answered that they had not and furthermore said that they had not told counsel that they had. "Counsel for defendant thereupon offered to prove that the witness(es) had in fact so informed counsel, and that counsel had put the witness(es) upon the stand in the belief in good faith that (they) would swear to the same facts upon the stand * * *." In State v. Burks, 132 Mo. 363, 34 S.W. 48, the appellant was charged with burglary with intent to rape. To sustain his defense that he had entered the house of the prosecuting witness pursuant to an agreement with the maid, not forcibly for the purpose of ravishing the prosecutrix, defendant called the maid as a witness. She denied any such agreement, the defendant proposed to treat her as a hostile witness subject to cross-examination and offered to prove her prior statements to defendant and his counsel to the contrary. In both of these cases the relevant rules were

all examined and restated, and it was held that the witnesses could not be thus cross-examined and impeached.

The federal cases relied on by the state do not aid or support its position here. In Tripp v. United States, 10 Cir., 295 F.2d 418, the charge was conspiracy to utter and sell counterfeit obligations of the United States. It was there held that contradictory statements of a "recalcitrant" witness "were admissible for the purpose of impeaching him, but it is well settled that contradictory statements introduced for the purpose of impeachment are not admissible as substantive evidence." And a further qualification of the federal rule, overlooked by the state, is this: "But such contradictory statements do not become substantive evidence *unless the witness recants his earlier testimony and admits or states that such statements correctly reflect the true facts. The effect of so doing is to make the statements a part of the witness's present testimony.*" (Emphasis supplied.) 295 F.2d 1. c. 425. This phase of the federal rule is illustrated and emphasized by the cited case of Harman v. United States, 4 Cir., 199 F.2d 34. In the often cited case of United States v. Block, 2 Cir., 88 F.2d 618, Judge Learned Hand did say that the trial court had properly allowed the prosecutor to cross-examine the government's "recalcitrant" witness, "it being obvious that he was suppressing truth," and confront him with prior contradictory statements. But the point the state overlooks is that even though the court charged the jury that "they might use any part of the statement which the witness had admitted; but none that he had not," the conviction was reversed, the court saying: "There was not the least color for allowing the jury to take it as his testimony on the stand, and the inevitable result was to get before them unsworn evidence in an exceptionally impressive and damaging way."

As a matter of fact the only support for the state's contention are the authoritative and respected teachers and authors, Wig-more and McCormick. Their impressive arguments are set forth in their texts (3 Wigmore, Evidence, Secs. 1017–1019, pp. 684–690; McCormick, Evidence, Secs. 38–39, pp. 70–82), and while it may be that no court has forthrightly accepted Dean McCormick's challenge "either to cause the courts to bring forward answering arguments supporting the orthodox rule, or to abandon it" (McCormick, p. 78), their views, admittedly, have not been adopted in any jurisdiction. Both Wigmore and McCormick hopefully cited Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400 as supporting their arguments but both concede that "the Missouri Court has since retreated from its pioneer position." McCormick p. 80; 3 Wigmore p. 688 n. 2. In this connection it is interesting to note that in 1935 Judge Ellison was the author of Pulitzer v. Chapman and in 1936 he was also the author of the leading case of State v. Gregory, supra. Judge Bennick made this analysis of Pulitzer v. Chapman: "In Pulitzer v. Chapman, supra, our Supreme Court did lay down the rule that, so far as concerns the impeachment of a witness by his deposition in the cause, not only may he be impeached by contradictory statements which appear therein, but his contradictory statements may also be accepted as substantive proof of the facts stated so far as they are competent and have probative value. This for the reason that testimony in a deposition is given both under oath and subject to the right of cross-examination, and is therefore not to be characterized as hearsay. However, it is to be noted that the court in its opinion specifically refused to hold that probative value should likewise be accorded to prior extrajudicial statements, and we are therefore left to follow the usual rule in such respects, which is that such statements are admissible only for the purpose of impeachment, assuming, of course, that the case is one where the impeachment of the witness is in order, a situation which we have shown did not exist in the instance under consideration." Woelfle v. Connecticut Mutual Life Ins. Co., 234 Mo.App. 1. c. 151, 112 S.W.2d 1. c. 874.

The other case cited by McCormick is the divided opinion (divided even as to what Wigmore means) of (1941) State v. Jolly, 112 Mont. 352, 116 P.2d 686, in which in any event the court said, "Thus Dees' statement, if tending to prove defendant's alleged statement constitutes no substantial evidence of the crime, and cannot sustain the verdict."

As indicated, the judgment is necessarily reversed and the cause remanded.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion of BARRETT, C., is adopted as the opinion of the court.

STORCKMAN, P. J., concurs in separate concurring opinion filed; EAGER, J., concurs in part and concurs in result in part in separate opinion filed; LEEDY, J., concurs in paragraph one of the opinion and the result, and concurs in the separate opinion of EAGER, J., believing that Boldizs (by changing his version of the solicitation by Mrs. Kinne to do away with her husband so as to characterize such solicitation as having been made "in a joking way" and from which change the trial court could have fairly inferred an effort and purpose on the part of the witness to suppress the truth) had become subject to cross-examination for the purpose of impeachment.

STORCKMAN, Presiding Judge (concurring).

I fully concur in the principal opinion by BARRETT, C., but believe there is still another reason why the state should not have been permitted to examine its witness John Boldizs in the manner it did.

When the prosecuting attorney asked the witness, "Was there anything ever said about your killing James Kinne for her", the question was fully answered when the witness said: "Yes, sir." The addition of the words "in a joking way" is not responsive to the question and appears to be entirely voluntary on the part of the witness, but there was no motion to strike.

Furthermore, as a general rule, the opinion or conclusion of a witness as to the meaning or effect of words spoken by another person is not admissible. See 23 C.J. S. Criminal Law § 878, p. 462, and State v. Irvin, 324 Mo. 217, 22 S.W.2d 772, 774 [4]. Whether the words were spoken by the defendant and her purpose in doing so were facts for the determination of the jury.

This is not to say that the circumstances under which the words were spoken and the attitude of the declarant at the time may not be fully developed as an aid to the jury in determining whether the words were spoken seriously or in jest. Nor does this opinion undertake to deal with the proper nature and extent of cross- or re-direct examination.

The standards for the impeachment of witnesses and the admission of substantive evidence especially in criminal cases are quite definitely established in this state and have been found quite satisfactory. They are generally in accord with those of other jurisdictions. In my opinion the instant record and circumstances do not present a proper case to vary or depart from these well-established rules

EAGER, Judge (concurring in part and concurring in result in part).

I feel that under the circumstances of this case Boldizs was in a very real sense a witness hostile to the State and thus subject to cross-examination for the purpose of impeachment only. The fact that the State's counsel do not argue this point is immaterial, for the public is a party to this proceeding and it is not to be estopped by any actions of its representatives. Since the evidence of prior statements was apparently considered as substantive evidence, the case must be reversed on that ground, as well as for error in the selection of the jury, in which latter phase of the opinion I concur.